IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

A. FREDDY LLERENA-ASPIAZU,                    *

           Plaintiff,                    *

v.                                            *        Civil Action No. 1:06CV00343 (RWR)

MAJOR LEAGUE SOCCER, et al.,                  *

           Defendants.                   *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

      Defendants, Major League Soccer, L.L.C., Hristo Stoitchkov, Anschutz D.C. Soccer, L.L.C., and Anschutz Entertainment Group, L.L.C., by their undersigned counsel, file this Memorandum in Support of their Motion for Summary Judgment.

## INTRODUCTION

      This case arises from an injury sustained by Plaintiff A. Freddy Llerena-Aspiazu ("Mr. Llerena") during a scrimmage between his American University varsity men's soccer team and the professional soccer team D.C. United on March 25, 2003.  The match was played at Reeves Field on the American University campus in the District of Columbia.  The injury occurred when D.C. United player Hristo Stoitchkov ("Mr. Stoitchkov") came in contact with Mr. Llerena during a challenge for a loose ball during the course of the match.  As a result of the contact, Mr. Llerena suffered a compound fracture to the tibia in his right leg.  In his First Amended Complaint, Mr. Llerena asserts four separate Counts and seeks $5,000,000 in compensatory damages from all Defendants and $5,000,000 in punitive damages from Mr. Stoitchkov individually.

      In Count I, Mr. Llerena asserts negligence against Mr. Stoitchkov, Major League Soccer,

L.L.C. ("MLS"), Anschutz D.C. Soccer, L.L.C. ("D.C. Soccer"), and Anschutz Entertainment Group, Inc. ("AEG"). Regarding Mr. Stoitchkov, Mr. Llerena argues that he failed to use the degree of care that a reasonable soccer player would have exercised under the circumstances. Mr. Llerena's claims of negligence against MLS, D.C. Soccer, and AEG in Count I are premised solely on the doctrine of vicarious liability. Under majority law, however, Mr. Llerena's negligence claim is barred because he was a voluntary participant in the organized sporting event and subjected himself to the dangerous inherent in the activity. Stated simply, the negligence standard does not apply to injuries occurring to players in a contact sport such as soccer; a higher level of proof is required.

In Count II, Mr. Llerena asserts reckless misconduct and reckless disregard of safety against Mr. Stoitchkov, MLS, D.C. Soccer, and AEG. Regarding Mr. Stoitchkov, Mr. Llerena argues that he was reckless and should have known that his actions created an unreasonable risk of substantial physical harm. Mr. Llerena's claims of reckless conduct against MLS, D.C. Soccer, and AEG in Count II are premised solely on the doctrine of vicarious liability. Mr. Llerena's claim of recklessness fails, however, because Mr. Stoitchkov's conduct was foreseeable and not outside the range of ordinary conduct in the context of a soccer match.

In Count III, Mr. Llerena asserts claims of negligent hiring, retention, and supervision against MLS, D.C. Soccer, and AEG. Mr. Llerena argues that these Defendants are directly liable to him for their decision to employ Mr. Stoitchkov as a soccer player despite actual or constructive knowledge that Mr. Stoitchkov behaved dangerously on the soccer field. This is the only count in which Mr. Llerena seeks recovery for the direct actions of MLS, D.C. Soccer, or AEG. Mr. Llerena's claims fail, however, because he does not support them with necessary expert testimony. Moreover, Mr. Llerena can offer no evidence that Mr. Stoitchkov was a danger to fellow soccer players.

In addition, D.C. Soccer and AEG did not employ Mr. Stoitchkov in his capacity as a soccer player.  Therefore, neither D.C. Soccer nor AEG can be held vicariously liable for Mr. Stoitchkov's conduct under Counts I or II.  This fact also prevents them from being liable for the hiring, retention, or supervision of Mr. Stoitchkov under Count III.

Finally, in Count IV, Mr. Llerena seeks punitive damages against Mr. Stoitchkov.  Mr. Llerena argues that Mr. Stoitchkov tackle constituted malicious conduct and/or was in willful disregard of Mr. Llerena's safety.  Mr. Llerena, however, cannot offer facts sufficient to meet the stringent standards for punitive damages, which are disfavored under District of Columbia law.

For the reasons stated more fully below, Defendants request that the Court enter summary judgment in their favor on all counts in Plaintiff's First Amended Complaint.  In the alternative, Defendants request that partial summary judgment be entered in favor of (1) D.C. Soccer and AEG as to Counts I, II, and III; (2) MLS as to Count III; and (3) Hristo Stoitchkov as to Count IV.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  The Players

In March 2003, Plaintiff Freddy Llerena was an 18 year-old freshman at American University ("AU") and a member of its varsity men's soccer team.  (Pl.'s First Amended Compl. at ¶10.)  At the time, the AU men's soccer team was engaged in its spring practice program in preparation for the upcoming Fall 2003 NCAA season.  (See Llerena Dep. at 77-78; relevant portions attached as **Exhibit A**.)

At the same time, Hristo Stoitchkov was a world-renowned professional soccer player in the twilight of his career.  He had recently joined the D.C. United roster after spending three years playing for an MLS club in Chicago.  (Stoitchkov Dep. at 48, 88; relevant portions attached as **Exhibit B**.)  In the 1990s, Mr. Stoitchkov was a star player for European powerhouse team F.C.

Barcelona and became a hero in his native country of Bulgaria for his play during the 1994 World

Cup.  He had received the 1989 European Golden Boot award as the top goal scorer in Europe.  In

1994, he had been honored as the top European Footballer of the Year.  In 2004, Pele named Mr.

Stoitchkov to his list of the 125 Greatest Living Footballers.

In his capacity as an MLS soccer player, Mr. Stoitchkov was employed by MLS.  (MLS

Answer to Interrog. No. 4; relevant portions attached as **Exhibit C**.)  D.C. Soccer concurrently

employed Mr. Stoitchkov as an assistant coach for the D.C. United team.  (D.C. Soccer Answer to

Interrog. No. 4; relevant portions attached as **Exhibit D**.)

In addition to being known as a superbly talented player, Mr. Stoitchkov was also known for

vocally protesting calls by referees.  During his international career, Mr. Stoitchkov had received

numerous yellow cards (cautions) for vocally protesting calls by referees.  (Stoitchkov Dep. at 28-

37.)  In some situations, Mr. Stoitchkov was ejected from games after receiving two yellow cards in

a single match for his protests.  (Id.)  In 1991, while playing in Barcelona, Mr. Stoitchkov was

involved in a regrettable protest with a referee during which he stepped on the referee's foot.  (Id. at

29-32.)  For this infraction, Mr. Stoitchkov received a six-month suspension that was later reduced

to 10 games after the referee apologized to the governing body and admitted that he had provoked

Mr. Stoitchkov.  (Id.) Very early in his career, in 1985, Mr. Stoitchkov was involved in a bench-

clearing shoving match during the final game of the Bulgarian Cup.  (Id. at 18-24.)  Mr. Stoitchkov

explained that the match, involving teams sponsored by the national army and national police, was

very political and hostile from the opening kick.  (Id. at 18-19.)  Mr. Stoitchkov and four other

players received a lifetime ban as a result of the incident, but their suspensions were cut to only 10

months after the Bulgarian politicians running the soccer league reached a compromise.  (Id. at 18-

24.)  In his three seasons with MLS prior to this incident, Mr. Stoitchkov received only three yellow

cards for protesting calls by referees and one red card in 2000 for pushing another player.  (Id. at 48, 175-76.)  In approximately thirty years of playing soccer prior to this incident, Mr. Stoitchkov had never injured another player.  (Id. at 15, 65.)

D.C. United was, and is still today, a Washington, D.C.-based professional soccer team and member of Major League Soccer.  (See dcunited.mlsnet.com.)  D.C. United is owned and operated by D.C. Soccer, a Delaware limited liability company and wholly owned subsidiary of AEG.  (Keenan Aff. at ¶ 3; attached as **Exhibit E**.)  In March 2003, D.C. United was in its preseason gearing up for the start of the MLS regular season, which was to begin in early April.  (See Stoitchkov Dep. at 88, 103.)

Major League Soccer was, and is still today, the premier professional soccer league in the United States.  (See mlsnet.com.)  MLS is comprised of 13 teams in cities throughout the country.  (Id.)  MLS has an Operating Agreement with each of its clubs outlining the operation of the league and the rights and duties of each individual team.  (See MLS Answer to Interrog. No. 3.)  MLS employs all players playing within the league.  Individual teams such as D.C. United are responsible for employing their respective coaching, training, and front office staffs.  Insofar as D.C. Soccer owned and operated D.C. United, D.C. Soccer employed Mr. Stoitchkov in his capacity as an assistant coach.

**B. The Match**

On March 25, 2003, AU and D.C. United met at Reeves Field for a prearranged scrimmage match. (Pl.'s First Amended Compl. at ¶ 13.)  In soccer, scrimmages are often called "friendly" matches (West Dep. at 26; relevant portions attached as **Exhibit F.**) although they can be anything but friendly.  Scrimmages can be very competitive as players compete in front of coaches in preparation for the upcoming season.  (Id. at 26-28.  Ramsey Dep. at 29-30; relevant portions attached as **Exhibit G.**)  Injuries can and do occur during scrimmages.  As an example, Mr. Stoitchkov had received a serious concussion during a scrimmage with another MLS team approximately one month prior to this match when he collided with a goaltender while chasing a loose ball.  (Stoitchkov Dep. at 92-95.)  One of Mr. Llerena's experts, Peter Ramsey, suffered a career-ending blow to the head during a preseason scrimmage while playing for an NCAA Division III college.  (Ramsey Dep. at 14-15.)

Scrimmages between professional and college teams are commonplace.  (See West Dep. at 24.)  AU and D.C. United had scrimmaged several times before.  (Id.)  AU head coach Todd West explained that he had no apprehension for the safety of his players in playing professionals.  (Id.)  Both he and Mr. Llerena were well aware that Mr. Stoitchkov was a D.C. United player and would be playing in the scrimmage.  (See id. at 59.  Llerena Dep. at 73.)  Mr. Llerena explained that, prior to the match, he was excited to be playing against Mr. Stoitchkov and the other professionals. (Llerena Dep. at 73.)  Coach West was eager to pit his team against the very best players D.C. United had to offer.  (West Dep. at 59.)

From the start of play, the match took on a competitive feel.  (Chapin Dep. at 17; relevant portions attached as **Exhibit H.**)  D.C. United scored an early goal, but American University was playing well.  (West Dep. at 35-36.)  At approximately the 8th minute of play, a D.C. United player

made a hard foul on an AU player to stop an AU scoring threat.  (See West Dep. at 36.)  The foul

resulted in the AU player remaining on the ground for several seconds before being able to rejoin

play.  Shortly after the foul, AU scored a tying goal.  (West Dep. at 36.)  Even in these early minutes

of the game, it was clear that both sides were going full speed and were playing to win the game.

(West Dep. at 37.  Chapin Dep. at 17.  See Llerena Dep. at 77-78.)

      Mr. Stoitchkov, who was the last D.C. United player between the AU attackers and the D.C.

United goaltender thought the tying AU goal was offsides.  (Stoitchkov Dep. at 112-113.)  The

assistant referee, however, did not call offsides and the AU goal counted, tying the match at one goal

apiece. (Chapin Dep. at 32-33.)  Mr. Stoitchkov protested the assistant referee's decision to not call

the goal offsides.  (Stoitchkov Dep. at 113.)  While protesting the call, referee Andrew Chapin

observed that Mr. Stoitchkov remained several paces away from the assistant referee and was never

nose-to-nose with him. (Chapin Dep. at 33.)  Mr. Stoitchkov, a native Bulgarian who only began

learning English in 2000 (Stoitchkov Dep. at 46), admitted that he might have used vulgar language

during his plea with the assistant referee (id. at 119).  Importantly, Mr. Stoitchkov was not given a

yellow card for his dissent even though MLS had instituted a "dissent initiative" for the 2003 season

that encouraged referees to issue yellow cards to players who argued with referees.  (Gazidis Dep. at

167; relevant portions attached as **Exhibit I**.)  After making his point to the referee, Mr. Stoitchkov

testified that he reset his state of mind back to where it was at the start of the game.  (Stoitchkov

Dep. at 114-15.)  His only intention at that point was to help his team score another goal and regain

the lead.  (Id. at 115.)

## C. The Play

After the AU goal, the ball was then reset for play and it was quickly played by Mr. Stoitchkov. (Bench Side Video at 0:00.)[1] Mr. Stoitchkov played a long pass into the left corner at American University's end of the field. (Id. at 0:02.) An American University player won a challenge for the ball in the corner and played it back toward midfield where it was played by Mr. Llerena. (Id. at 0:08.) Mr. Llerena touched the ball with his right foot and it popped into the air above his head and to his right. (Id. at 0:09. Opposite Angle Video at 0:02.) At this time, Mr. Stoitchkov began running toward Mr. Llerena. (Id.) As the ball dropped toward the ground, Mr. Llerena raised his right leg to play the ball. (Bench Side Video at 0:09. Opposite Angle Video at 0:03.) Mr. Stoitchkov, who was still running toward Mr. Llerena, raised his left leg[2] in the direction of the ball, which at this time was between him and Mr. Llerena. (Id.)

As the two players met, both turned away from one another with Mr. Llerena turning to his left and Mr. Stoitchkov turning to his right. (Bench Side Video at 0:10. Opposite Angle Video at 0:03.) While in the process of turning and to stop his forward momentum, Mr. Stoitchkov planted his formerly extended left leg toward the ground. (Id.) His foot, however, came down on Mr. Llerena's now planted right leg and broke Mr. Llerena's tibia and fibula. (Id. Pl.'s First Amended Compl. at ¶ 16.) Both players fell to the ground. (Bench Side Video at 0:10.) The ball, which was once in between the two players and falling directly toward the ground, rolled toward the American University goal and was collected by a D.C. United player. (Bench Side Video at 0:11. Opposite

---

[1] Defendants will attach a CD containing two videos of the incident as **Exhibit J** and provide it to the Court under separate cover. The video entitled "Bench Side Video" was taken above and behind the incident. The video entitled "Opposite Angle Video" was taken from across the field and at field level. Although the quality of the videos is poor, the teams can be easily distinguished by their uniform colors. D.C. United was wearing white jerseys with black shorts. AU was in all red.
[2] Mr. Stoitchkov was one of very few professional soccer players with a dominant left leg. (Stoitchkov Dep. at 57-58.)

Angle Video at 0:05.)

Mr. Stoitchkov was immediately issued a red card for the play, which ejected him from the match.  (Chapin Dep. at 21.)  Referee Andrew Chapin would later explain in a Competition Incident Report that Mr. Stoitchkov was sent off for "serious foul play," an infraction under the rules of soccer occurring when a player uses excessive force.  (See id.)  Notably, Mr. Chapin's Competition Incident Report grossly mischaracterized the play, asserting that Mr. Stoitchkov tackled Mr. Llerena with both feet in the air and while the ball was sitting on the ground at Mr. Llerena's feet.  (Id. at 27-28, 31.)  Mr. Chapin retracted these statements during his deposition after he had the opportunity to view the videotape of the match during a private meeting with Plaintiff's counsel a week earlier.  (Id at 26, 27-28, 31.)  Significantly, he testified that, in fact, Mr. Stoitchkov used only one foot and the ball was in the air at the time of the tackle.  (Id. at 27-28, 31.)

After an investigation by MLS, Mr. Stoitchkov was fined $2,000 and suspended for two games as a result of the play.  (Gazidis Dep. at 162-63.)  Historically, MLS used disciplinary measures such as those imposed against Mr. Stoitchkov to send a message to players that MLS takes very seriously plays that result in injuries to other players.  (Machnik Dep. at 84-85; relevant portions attached as **Exhibit K**.)

## <u>LEGAL STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may at any time move for summary judgment as to all or any part of the case.  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where there is no triable question of fact and it appears that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Miller v. FDIC</u>, 906 F.2d 972, 973 (4th Cir. 1990).  In other words, summary judgment should be granted where it is clear that no genuine issue of fact is involved and inquiry into facts is not desirable to

clarify the application of law.  Charbonnages De France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  While any permissible inference must be viewed in the light most favorable to the non-moving party, where the record taken as a whole could not lead a rational finder of fact to find for the non-moving party, disposition by summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

Once a motion for summary judgment is made and supported, the non-moving party "may not rest upon the mere allegations or denials of [that] party's pleading, but…must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56 (e); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec., 475 U.S. at 586.  It must show that there is sufficient evidence from which a reasonable fact-finder could find in its favor.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This standard "mirrors the standard for a directed verdict under Fed. R. 50 (a), which is that the trial judgment must direct a verdict if, under the governing law, there can be but one reasonable conclusion."  See Anderson, 477 U.S. at 250.  In determining the sufficiency of the non-moving party's evidence, all inferences should be resolved in favor of the non-moving party, Matsushita, 475 U.S. at 587, but only such evidence as would be admissible at trial can be considered. Wilson v. Clancy, 747 F. Supp. 1154, 1158 (D. Md. 1990), aff'd, 940 F.2d 654 (4th Cir. 1991).

## ARGUMENT

**I.  Defendants Are Entitled to Summary Judgment on Counts I and II of Mr. Llerena's First Amended Complaint**

In Count I, Mr. Llerena asserts negligence against Mr. Stoitchkov, MLS, D.C. Soccer, and AEG arguing that Mr. Stoitchkov breached his duty of reasonable care and that liability can be imputed to the other Defendants based on their employment relationship with Mr. Stoitchkov. Count II differs in that Mr. Llerena claims that Mr. Stoitchkov's actions were reckless. As will be explained below, courts recognize an exception to the general rule of negligence in the context of contact sports that bars Mr. Llerena's negligence action. In addition, even under the heightened recklessness standard, Mr. Llerena's claim fails as Mr. Stoitchkov's tackle was within the range of foreseeable activity in soccer. In addition, that D.C. Soccer and AEG did not employ Mr. Stoitchkov as a soccer player prevents them from being held vicariously liable for his on-field conduct.

**A.  Defendants Are Entitled to Summary Judgment as to Count I of Mr. Llerena's First Amended Complaint, as Mr. Llerena Cannot Recover Under Mere Negligence for Injuries Occurring While Participating in a Contact Sport**

The vast majority of jurisdictions addressing cases where a plaintiff seeks to recover for injuries sustained while participating in a contact sport have adopted recklessness as the applicable standard of care instead of simple negligence.[3]  See, e.g., Jaworski v. Kiernan, 696 A.2d 332, 338 (Conn. 1997) (collecting cases). This heightened standard of care replaces the normal reasonableness inquiry, making mere negligence insufficient to impose liability on a co-participant in an athletic event. See, e.g., Kavanagh v. Trustees of Boston Univ., 795 N.E.2d 1170, 1179 (Mass. 2003). This exception to the normal standard of negligence has often been referred to as the contact-

---

[3] The District of Columbia Court of Appeals has not yet addressed this issue.

11

sports-exception, <u>see</u>, <u>e.g.</u>, <u>Pfister v. Shusta</u>, 657 N.E.2d 1013, 1018 (Ill. 1995), although it has also

been applied to cases involving non-contact sports, <u>see</u>, <u>e.g.</u>, <u>Bowman v. McNary</u>, 853 N.E.2d 984,

988 (Ind. 2006) (applying the exception to a golf-related incident).

In supporting the application of the contact-sports-exception, courts have accounted for

public policy concerns, the expectations of athletic participants, and the effect on the judicial system.

As for public policy concerns about promoting vigorous athletic competition, the exception has

been described as "a commonsense distinction between excessively harmful conduct and the more

routine rough-and-tumble of sports that should occur freely on the playing fields and should not be

second-guessed in courtrooms."  <u>Crawn v. Campo</u>, 643 A.2d 600, 607 (N.J. 1994).  The rule also

comports with the expectations of athletes who realize that rule violations and injuries can and do

occur during sporting activity.  <u>Jaworski</u>, 696 A.2d at 337.  Finally, the exception avoids a flood of

litigation that might result if "every punter with whom contact is made, every midfielder high

sticked, every basketball player fouled, every batter struck by a pitch, and every hockey player

tripped" were only required to prove negligence to maintain a lawsuit.  <u>Id</u>. at 338.

Courts have also found support for the contact-sports exception in the doctrine of primary

assumption of risk.  <u>Whelihan v. Espinoza</u>, 110 Cal. App. 4th 1566, 1572 (Cal. App. 2003).  Stated

simply, the doctrine stands for the proposition that one who assumes the risks inherent with an

athletic endeavor are no longer owed a duty of due care by a fellow participant.  <u>Id</u>.  Thus, a cause of

action in negligence is defeated for lack of a duty.  <u>Id</u>.

In this case, there is no dispute that soccer is a contact sport.  Mr. Llerena and his experts

have all testified that contact is an integral part of the game and permissible under the rules.

(Llerena Dep. at 60.  Ramsey Dep. at 26.  Manella Dep. at 26; relevant portions attached as **Exhibit

L**.)  In addition, courts addressing soccer cases have unanimously held soccer to be considered

among the class of contact sports. See, e.g., Jaworski, 696 A.2d at 336 (recognizing that soccer "is

replete with occasions when the participants make contact with one another during the normal

course of the game"); Kline v. OID Assoc., Inc., 609 N.E.2d 564, 566 (Ohio 1992) (noting that,

"[g]etting kicked is a common occurrence in soccer, because of the closeness of the players who are

also trying to kick or block the ball"; citation omitted). Accordingly, the contact-sports-exception

applies to Mr. Llerena's claim and he must prove that Mr. Stoitchkov's conduct was reckless to hold

Mr. Stoitchkov liable for his damages. Even assuming negligence could be proven, it is not enough

under these facts.[4] Defendants are therefore entitled to judgment as a matter of law on Count I of

Mr. Llerena's First Amended Complaint.

---

[4] Even under the minority position allowing recovery for negligence, Mr. Llerena's claim would be barred by his assumption of the risk. Under District of Columbia law, the doctrine of assumption of the risk operates as a bar to an action for negligence when a plaintiff has assumed a known risk. Maalouf v. The Swiss Confederation, 208 F. Supp. 2d 31, 43 (D.D.C. 2002) (applying District of Columbia law). Summary judgment in favor of a defendant based on a plaintiff's assumption of the risk is appropriate where there is no dispute that the plaintiff was aware of the danger, but nevertheless proceeded to undertake the activity. Id. at 42-43. In this case, there is no factual dispute that Mr. Llerena was aware that he would be playing against professionals in a competitive game during which he was subject to being injured. Prior to this incident, Mr. Llerena had consciously recognized that he might be injured playing soccer. (Llerena Dep. at 61.) In fact, he was quoted shortly after the incident as saying that, "[t]here is always a risk in soccer." (Id. at 63-64.) He further explained that, "[a]s soccer players, we take the risk by playing." (Id. at 134.) Mr. Llerena had previously been injured during a soccer game by contact with another player. (Id. at 15-16.) He knew that it was common for players to make aggressive tackles worthy of yellow or red cards. (Id. at 67.) He had also seen "cleats up" tackles before in high school and college games in which he had played. (Id. at 90.) Mr. Llerena also voluntarily engaged in this inherently dangerous sport against professionals. Mr. Llerena was aware that he would be playing against professionals on D.C. United including Mr. Stoitchkov. (Id. at 73.) From watching professional soccer matches on television, Mr. Llerena knew that the pro game was much faster than that at the college level (Id. at 75-76.) Even though this was a scrimmage, Mr. Llerena knew that it could be competitive because preseason games affect starting rosters during the upcoming season. (See id. at 78.) In sum, Mr. Llerena was aware of the danger involved in playing in this match. He, as did every other player on both teams that day, accepted the risk of injury when he stepped onto the field. Accordingly, Mr. Llerena's negligence claim, if it is at all tenable, is barred as a matter of law by his assumption of the risk.

**B.  Defendants Are Entitled to Summary Judgment as to Count II of Mr. Llerena's First Amended Complaint, as Mr. Llerena Cannot Prove that Defendant Stoitchkov Acted Recklessly**

To determine whether an athlete acted recklessly such that he may be liable for injury to a co-participant during a sporting event, courts look to the Restatement for guidance.  See, e.g., Bentley v. Cuyahoga Falls Bd. of Educ., 709 N.E.2d 1241, 1243 (Ohio 1998).  As described in the Restatement:

> The actor's conduct is in reckless disregard of the safety of others if he does an act . . . knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts, § 500 (1965).  In applying this standard to determine whether an act constituted an unreasonable risk in the context of a sporting event, a court must reference "the way the particular game is played, i.e., the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game."  Bentley, 709 N.E.2d at 1243 (quotation omitted).  Whether or not a particular action was foreseeable is therefore a necessary element in determining whether the action was an unreasonable risk.  Id. at 1245.

Recent courts have distilled the recklessness inquiry into a determination as to whether the conduct complained of is "totally outside the range of ordinary activity involved in the sport."  See, e.g., Bowman, 853 N.E.2d at 988 (2006 decision; stating the general rule that, "voluntary participants in sports activities . . . cannot recover for injury unless it can be established that the other participant either intentionally caused injury or engaged in conduct so reckless as to be totally outside the range of ordinary activity involved in the sport"; quotation omitted); Whelihan, 110 Cal. App. 4th at 1575; Allen v. Dover Co-Recreational Softball League, 807 A.2d 1274, 1285 (2002)

14

(stating that a plaintiff must show that the conduct must be "totally outside the range of ordinary activity involved in the sport" even under the less stringent negligence standard of care applied by a small minority of jurisdictions). Accordingly, conduct deemed within the normal course of play is not reckless and therefore does not expose the athlete to liability for an injury occurring during the activity. Because the threshold of recklessness goes to whether the plaintiff has established a duty, "it is a question of law for the determination of the court, whether the injury-causing event was an inherent or reasonably foreseeable part of the game." Bowman, 853 N.E.2d at 988 (quotation omitted).

Turning to the tackle that is the subject of this lawsuit, no reasonable juror could conclude that it was outside the normal course of play. Soccer is a free-flowing game with no set positional play. Possession is a key aspect of the game. (Ramsey Dep. at 31. Manella Dep. at 24-25.) It goes without saying that a team cannot score unless it first gains possession of the ball. (Id.) Soccer players are taught to fight for possession and to attack for the ball as opposed to standing in place and hoping that it comes to them. (Ramsey Dep. at 30, 90.) Tackles are a permissible means by which a soccer player may attempt to take the ball away from a player with possession or take possession of a loose ball. (Ramsey Dep. at 31. Manella Dep. at 36.) This is not a case where Mr. Stoitchkov gave Mr. Llerena a "cheap shot" from behind and away from the ball in a blatant attempt to intimidate him or take him out of the game. Cf. Hackbart v. Cincinnati Bengals, Inc., 601 F.2d 516 (10th Cir. 1979). Nor can Mr. Stoitchkov's actions be equated to those of a player throwing a punch at an opponent during a brawl (e.g., 1977 NBA incident involving Kermit Washington and Rudy Tomjanovich; see en.wikipedia.org/wiki/Kermit_Washington#_note-0).

In Bentley, the Court of Appeals of Ohio dealt with a case factually similar to the one presented here. Bentley arose when two female high school soccer players collided while fighting

for a loose ball. 709 N.E.2d at 1242.  The plaintiff in <u>Bentley</u>, Kristine, had reached the ball first and

had kicked it away when two seconds later the defendant, Ellie, performed a poorly-executed slide

tackle, missing the ball and sweeping through Kristine's legs.  <u>Id</u>.  As a result of the contact, Kristine

suffered a broken fibula and tibia in one of her legs.  <u>Id</u>.  In upholding the trial court's grant of

summary judgment in favor of Ellie, the <u>Bentley</u> court held that Ellie's slide tackle and its results

were a foreseeable part of soccer and therefore not reckless.  <u>Id</u>. at 1245.

That Mr. Stoitchkov received a red card for his tackle does not in any way make his conduct

reckless for purposes of assessing liability in this action.  That situation was also present in <u>Bentley</u>,

as Ellie received a red card for her tackle.  <u>Id</u>. at 1243.  The <u>Bentley</u> court rejected the notion that a

violation of a rule is indicative of recklessness and stated that foreseeability is a necessary

requirement.  <u>Id</u>. at 1245.  Based on the evidence presented in the case, the court concluded that a

slide tackle, even one worthy of a red card ejection from a match, was a foreseeable part of playing

soccer.  <u>Id</u>. at 1244.

In another soccer case involving a challenge for possession of the ball, the Supreme Court of

Connecticut further elaborated on the foreseeability of rule infractions in sport:

> In games, particularly those played by teams and involving
> some degree of physical contact, it is reasonable to assume that the
> competitive spirit of the participants will result in some rules
> violations and injuries.  That is why there are penalty boxes, foul
> shots, free kicks, and yellow cards.  . . . Some injuries may result
> from such violations, but such violations are nonetheless an accepted
> part of any competition.  Simply put, when competitive sports are
> played, we expect that a participant's main objective is to be a
> winner, and we expect that players will pursue that objective
> enthusiastically.  We also anticipate that players in their enthusiasm
> will commit inadvertent rules violations from which injuries may
> result.  The normal expectations of participants in contact team sports
> include the potential for injuries resulting from conduct that violates
> the rules of the sport.

Jaworski, 696 A.2d at 337.[5]

In this case, there is no factual dispute that Mr. Llerena was aware that he would be playing against professionals in a competitive game during which he was subject to being injured.  Prior to this incident, Mr. Llerena had consciously recognized that he might be injured playing soccer. (Llerena Dep. at 61.)  In fact, he was quoted shortly after the incident as saying that, "[t]here is always a risk in soccer."  (Id. at 63-64.)  He further explained that, "[a]s soccer players, we take the risk by playing."  (Id. at 134.)  Mr. Llerena had previously been injured during a soccer game by contact with another player.  (Id. at 15-16.)  He knew that it was common for players to make aggressive tackles worthy of yellow or red cards.  (Id. at 67.)  He had also seen "cleats up" tackles before in high school and college games in which he had played.  (Id. at 90.)  Mr. Llerena was aware that he would be playing against professionals on D.C. United including Mr. Stoitchkov.  (Id. at 73.) From watching professional soccer matches on television, Mr. Llerena knew that the pro game was much faster than that at the college level  (Id. at 75-76.)  Even though this was a scrimmage, Mr. Llerena knew that it could be competitive because preseason games affect starting rosters during the upcoming season.  (See id. at 78.)  In sum, that the match with D.C. United could involve fierce competitive play, possibly involving tackles worthy of yellow or red cards including raised-cleats tackles, and even result in injury was foreseeable by Mr. Llerena before he even stepped onto the field that day.

In this case, the speed and force at which Mr. Stoitchkov entered the tackle has been deemed by Mr. Llerena's experts, in hindsight, to have been excessive.  (Ramsey Dep. at 46-47.  Manella

---

[5] The Jaworski court also recognized the risk of injury to the lower extremities inherent in soccer, noting the nature of the game and that participants are required to wear shin guards.  696 A.2d at 336.  The court explained: "When two soccer players vie for control of the ball, the lower limbs are especially vulnerable to injury.  If a player seeks to challenge another player who has possession of the ball, the resulting contact could reasonably be foreseen to result in injury to either player."  Id.

Dep. at 42-43.)  Mr. Stoitchkov's rules violation, however, must be viewed in the proper context.

Mr. Stoitchkov's split-second decision to fight for possession of the ball Mr. Llerena had failed to

control, even if too aggressive in retrospect, stands in stark contrast to more defined rules violations

such as using a stick as a weapon in hockey or a pre-planned chop block in football.  That an

opposing player such as Mr. Stoitchkov might use his extraordinary speed and exceptional skill to

aggressively challenge for possession of a poorly-played and loose ball mere yards away from his

opponent's goal was a foreseeable consequence to Mr. Llerena, an experienced and talented player

in his own right.  In addition, Mr. Llerena was aware from the outset of the match of the tempo and

competitive nature of the match and that D.C. United intended to challenge for every ball in an

attempt to win.  Mr. Stoitchkov's tackle was a play on the ball and within the normal course of

activity occurring during a soccer game.

        The severity of Mr. Llerena's injury does not make Mr. Stoitchkov's actions any more or

less reckless.  What must be examined are his actions leading up to the injury, not the injury itself.

In this regard, if Mr. Llerena had only suffered a minor bruise to his leg because Mr. Stoitchkov's

foot made only a glancing blow, no one would suggest that Mr. Stoitchkov would be liable to Mr.

Llerena for causing the bruise even assuming Mr. Stoitchkov's actions up to that point remained the

same.  In contrast, if a hockey player swings a stick at an opposing player's head in anger, but

misses, there would be no question that his conduct was reckless.  The point is that the severity of

the injury does not affect the determination of recklessness; the actions leading up to the injury are

what must be evaluated.

        In sum, Mr. Stoitchkov's tackle was not totally outside the normal range of activity in a

soccer match such that he can be held liable for Mr. Llerena's injury caused by the tackle.

Accordingly, Defendants are entitled to judgment as a matter of law on Count II of Mr. Llerena's

First Amended Complaint.

**C.  In the Alternative, D.C. Soccer and AEG Are Entitled to Summary Judgment as to Counts I and II**

Distinct from the standard of care arguments as to Counts I and II regarding all Defendants, Defendants D.C. Soccer and AEG cannot be held vicariously liable for Mr. Stoitchkov's on-field actions.

**1.  Hristo Stoitchkov Was Not Acting in his Capacity as a D.C. United Assistant Coach When He Tackled Mr. Llerena**

At the time of this incident, Hristo Stoitchkov was concurrently employed by MLS as a professional soccer player and by D.C. Soccer as an assistant coach for the D.C. United team.  (MLS Answer to Interrog. No. 4.  D.C. Soccer Answer to Interrog. No. 4.)  Mr. Stoitchkov explained that his assistant coaching duties involved running drills during practices with the strikers.  (Stoitchkov Dep. at 51-54.)  On game days, he would run players through pre-game warm-ups and would then switch over to being a full-time player during the course of the game.  (Id.)  Accordingly, Mr. Stoitchkov's allegedly negligent and/or reckless action – the tackle – was done by Mr. Stoitchkov in his capacity as a player and not as a D.C. United assistant coach.

The conclusion that Mr. Stoitchkov was acting as a player and not an assistant coach was supported by other witness testimony.  Todd West, AU's head coach, was previously an assistant coach for D.C. United and gave some insight as to Mr. Stoitchkov's coaching duties.  (West Dep. at 9-10.)  Coach West explained that an assistant coach's duties included warming up players and perhaps watching the flow of the game from a higher vantage point to develop strategy.  (Id.)  Both of Mr. Llerena's standard of care experts, Mr. Ramsey and Mr. Manella, testified that Mr. Stoitchkov was a player and not a coach when he made the subject tackle.  (Ramsey Dep. at 84. Manella Dep. at 108.)

Mr. Stoitchkov was therefore acting outside the scope of his employment with D.C. Soccer when he took the actions criticized by Plaintiff in this case. Therefore, D.C. Soccer cannot be vicariously liable for such actions.

### 2. Defendant Stoitchkov Was Not an Employee of AEG

Defendant Stoitchkov was never employed by AEG in any capacity. (Keenan Aff. at ¶ 5.) As explained immediately below, AEG's only relation to this case is that it is the corporate parent of D.C. Soccer. Therefore, AEG cannot be held vicariously liable for Mr. Stoitchkov's actions.

### 3. Even Assuming That D.C. Soccer Could be Held Liable, AEG is Shielded from Liability

AEG is a member of D.C. Soccer, which is a Delaware limited liability company (Keenan Aff. at ¶ 3.) Under District of Columbia law, the liability of a foreign limited liability company's members is determined by the law under which the entity was formed. D.C. Code Ann. § 29-1052. Therefore, whether AEG could be held liable for the actions of D.C. Soccer or its employees is determined by Delaware law. Under Delaware law, "no member or manager of a limited liability company shall be obligated personally" for debts "arising in contract, tort or otherwise." Del. Code Ann. tit. 6, § 18-303. Accordingly, AEG cannot be held liable for the actions of D.C. Soccer or its employees and AEG is therefore entitled to judgment as a matter of law on Counts I and II of Mr. Llerena's First Amended Complaint.

**II.  MLS, D.C. Soccer, and AEG Are Entitled to Summary Judgment on Count III of Mr. Llerena's First Amended Complaint**

   **A.  Mr. Llerena Fails to Support His Claims for Negligent Hiring, Retention, and Supervision With Necessary Expert Testimony**

In a negligence action, District of Columbia law requires expert testimony to prove the standard of care where "the subject in question is so distinctly related to some … occupation as to be beyond the ken of the average layperson."  District of Columbia v. Hampton, 666 A.2d 30, 35 (D.C. 1995) (quotation omitted).   Only when the "negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience" is the requirement of expert testimony lifted.  Id. (quotation omitted).  The claims in Count III of Mr. Llerena's First Amended Complaint involve the hiring, training, and supervision of a professional soccer player – a subject matter clearly outside the knowledge held by the average layperson.

The Hampton Court recognized that District of Columbia Court of Appeals has been steadily enlarging the class of cases in which expert testimony is required.  Id.  In recent years the Court of Appeals has required expert testimony in cases involving a wide range of subjects that were often very familiar to the average layperson.  See, e.g., Hill v. Metropolitan African Methodist Episcopal Church, 779 A.2d 906 (D.C. 2001) (crowd control at large church gathering); Katkish v. District of Columbia, 763 A.2d 703 (D.C. 2000) (danger posed by leaning tree); Hampton, 666 A.2d 30 (social workers' selection and supervision of foster parents); Messina v. District of Columbia, 663 A.2d 535 (D.C. 1995) (amount of cushioning material necessary beneath playground equipment); District of Columbia v. Carmichael, 577 A.2d 312 (D.C. 1990) (protection of prison inmates from other prisoners); Lenkin-N Limited Partnership v. Nace, 568 A.2d 474 (D.C. 1990) (reasonableness of delay on construction project); District of Columbia v. Freeman, 477 A.2d 713 (D.C. 1984) (sufficiency of pedestrian safety measures at

intersection).  In each of these cases, the subject matter, although familiar to the lay juror, was deemed "too technical" to fall within the "common knowledge" exception.  Hampton, 666 A.2d at 36.

Conversely, the class of recent cases employing the common knowledge exception is substantially smaller in number.  Id.  Only where the standard of care was patently obvious has the exception been employed.  Id.  For example, expert testimony was not required in a suit against a hospital for permitting a 93-year-old patient to fall from her bed.  Washington Hosp. Ctr. v. Martin, 454 A.2d 306 (D.C. 1982).

Here, Mr. Llerena alleges that (1) MLS, D.C. Soccer, and AEG knew or should have known that Mr. Stoitchkov behaved dangerously on the soccer field, (2) that they were negligent in hiring him to play soccer, and (3) once making the hiring decision, they were negligent in supervising him in his position as a soccer player.  (Pl.'s First Amended Compl. at ¶ 28.)   Even assuming the average layperson in the United States is at all familiar with the game of soccer, he or she has no knowledge of how professional soccer players are evaluated, coached, or supervised, or the customary practices within the professional soccer community.  In other words, the hiring and coaching of a professional soccer player, especially at a level as high as MLS, is a highly specialized task involving skill and judgment beyond the knowledge of the average layperson.

Mr. Llerena has offered no expert testimony to support his negligent hiring, retention, and supervision claim against MLS, D.C. Soccer, and AEG.  Neither of his liability experts, Mr. Ramsey nor Mr. Manella, were at all critical of MLS in hiring Mr. Stoitchkov to be a player in their league or of the D.C. United coaching staff in the way they supervised Mr. Stoitchkov before or during the subject match.  (Ramsey Dep. at 84-85.  Manella Dep. at 108-09.)  Neither

22

could point to any incident in the past where Mr. Stoitchkov had injured a fellow player during a match.  (Ramsey Dep. at 86.  Manella Dep. at 110.)

A lay juror could only determine the standard of care for the hiring, training, or supervision of a professional soccer player through aid by expert witnesses.  To make an informed decision, the jury must be able to understand the many considerations that influence the hiring of a professional soccer player, the methodology of training, the nature of the sport, and the rules of the game.  Without the assistance of expert testimony, the jury would be left to speculate as to the standard of care applicable to MLS's decision to hire Mr. Stoitchkov to play in their league.  A prima facie case of negligence cannot rest upon speculation as to the prevailing standard of care.  Accordingly, MLS, D.C. Soccer, and AEG are entitled to summary judgment on Mr. Llerena's negligent hiring, retention, and supervision claims in Count III of his First Amended Complaint.

**B.  In Addition, Mr. Llerena Can Offer No Evidence Showing That MLS, D.C. Soccer, or AEG Had Actual or Constructive Knowledge That Mr. Stoitchkov Presented a Risk of Harm to Other Players**

Separate from Mr. Llerena's evidentiary deficiency in not supporting his negligent hiring claim with required expert testimony is his inability to offer any evidence that Mr. Stoitchkov's history showed he was a danger to other players on the field.  Mr. Llerena will likely point to Mr. Stoitchkov's involvement in the Bulgarian Cup brawl in 1985, his incident with the referee in Spain in 1991, or the number of yellow and red cards he received to attempt to show that Mr. Stoitchkov was a walking time bomb on the field.  These incidents and infractions are completely irrelevant in supporting Mr. Llerena's claim that Mr. Stoitchkov was a danger to his fellow athletes.

That Mr. Stoitchkov argued calls with referees is not indicative that he posed any threat to

his opponents.  This evidence only shows his propensity to vocalize his emotions to referees, not act in a violent manner toward his fellow athletes.

      As for Mr. Stoitchkov's involvement in the 1985 Bulgarian Cup melee, Mr. Llerena cannot reasonably rely on that event to support his claims.  At the outset, that incident happened almost 20 years prior to the incident involving Mr. Llerena at a time when Mr. Stoitchkov was 19 years old. (<u>See</u> Stoitchkov Dep. at 8.)  More fundamentally, that incident was a mutual eruption of emotion numerous players from both teams – an event not totally out of the ordinary in sports.  Finally, Mr. Stoitchkov's suspension was just as likely motivated by the political adversaries of his team than anything else.  (<u>See</u> Stoitchkov Dep. at 18-24.)

      In the context of employing athletes, the Ohio Supreme Court has held that, "[t]o successfully state a cause of action under the theory of negligent supervision, the party must produce evidence such as a defendant allowing a player with a known propensity toward violence to play or allowing a team to play when there was a total absence of management."  <u>Kline v. OID Assoc., Inc.</u>, 609 N.E.2d 564, 565 (Ohio 1992).  There is no evidence in the record here to support such a finding. As recognized by Mr. Llerena's liability experts, there simply were no prior incidents in which Mr. Stoitchkov acted violently toward a fellow player.  (Ramsey Dep. at 86.  Manella Dep. at 110.)  As such, Mr. Llerena's negligent hiring, retention, and supervision claims fail as a matter of law.

**C. In the Alternative, Neither D.C. Soccer Nor AEG Employed Mr. Stoitchkov as a Soccer Player and Therefore Cannot Be Held Liable for Hiring, Retaining, or Supervising Him In That Capacity**

By the very language used in Count III, Mr. Llerena makes clear that his claim for negligent

hiring, retention, and supervision relates solely to Mr. Stoitchkov's on-field behavior:

> [D.C. Soccer, AEG,] and MLS knew or should have known that Stoitchkov behaved in a dangerous manner <u>*on*</u> the soccer field. . . . [D.C. Soccer, AEG,] and MLS were negligent in hiring and retaining Stoitchkov to <u>*play*</u> soccer.

(Pl.'s First. Amended Compl. at ¶ 28; emphasis added.)  Mr. Stoitchkov, however, was employed by

D.C. Soccer only as an assistant coach.  (D.C. Soccer Answer to Interrog. No. 4.)  Mr. Stoitchkov

was not an employee of AEG at all.  (Keenan Aff. at ¶ 5.)  Therefore, D.C. Soccer and AEG cannot

be held liable for hiring, retaining, or supervising Mr. Stoitchkov as a professional soccer player.

**III. Hristo Stoitchkov Is Entitled to Summary Judgment on Count IV Arguing for Punitive Damages Or, In the Alternative, the Issue of Punitive Damages Should Be Bifurcated From the Liability Phase of Trial**

**A. Plaintiff Cannot Offer Evidence Sufficient to Support an Award of Punitive Damages**

Punitive damage awards are disfavored in the District of Columbia.  <u>Henson v. W.H.H. Trice</u>

<u>and Co.</u>, 466 F. Supp. 2d 187, 193 (D.D.C. 2006).  Accordingly, plaintiffs are awarded punitive

damages only when appropriate to punish the defendant for acting "with evil motive, actual malice,

or in willful disregard for the rights of the plaintiff."  <u>Bragdon v. Twenty-Five Twelve Assoc., L.P.</u>,

856 A.2d 1165, 1173 (D.C. 2004) (quotation omitted).  Further, plaintiffs must prove the need for

punitive damages by clear and convincing evidence – an elevated burden of proof.  <u>See</u> <u>Jonathan</u>

<u>Woodner, Co. v. Breeden</u>, 665 A.2d 929, 932 (D.C. 1995), <u>cert. denied</u>, 519 U.S. 1148 (1997).

Only in the rarest of circumstances are punitive damages available for non-intentional torts.

<u>Butera v. District of Columbia</u>, 235 F.3d 637, 657 (D.C. Cir. 2001).  The recognized exceptions are

bringing a lawsuit in bad faith, <u>Jemison v. National Baptist Convention, USA, Inc.</u>, 720 A.2d 275,

285 (D.C. 1998), breach of contract equating to a willful tort, <u>Bernstein v. Fernandez</u>, 649 A.2d

1064, 1073 (D.C. 1991), and willful breach of fiduciary duty, Washington Medical Ctr., Inc., 573

A.2d 1269, 1284 (D.C. 1990). These cases recognizing an exception to the general rule do not, as

this case does, involve claims that a defendant merely breached the standard of care.

 In this case, there is no evidence from which a reasonable jury could infer that Mr.

Stoitchkov acted with evil motive or malice. Mr. Stoitchkov's decision to play the ball Mr. Llerena

was unable to control was made in a split second as the ball popped up and away from Mr. Llerena.

Mr. Stoitchkov's only motivation at that time was to help his team score another goal and to win the

match. (Stoitchkov Dep. at 115.) There had been no prior altercation between Mr. Stoitchkov and

Mr. Llerena that might indicate Mr. Stoitchkov's actions were payback for an earlier transgression.

Although Mr. Llerena will argue that Mr. Stoitchkov's dissent with the referee minutes prior to the

play was indicative of his agitated state, that exchange was limited to Mr. Stoitchkov and the

assistant referee. Mr. Llerena was not at all involved in the exchange and, in fact, was not one of the

AU players Mr. Stoitchkov had asserted was offsides. (Llerena Dep. at 82.)

 Also indicative of a lack of evil motive or malice on the part of Mr. Stoitchkov was his

demeanor after the play. Mr. Stoitchkov immediately saw that he was given a red card, he stood up,

and he walked toward his bench. (Stoitchkov Dep. at 148-49.) He did not stand over or taunt Mr.

Llerena or the AU bench nor did he make any aggressive gesticulations sometimes seen in sports.

More importantly, once Mr. Stoitchkov learned that Mr. Llerena was injured, he returned to field

and kneeled by Mr. Llerena trying to comfort him until he was taken off the field by paramedics.

(<u>Id</u>. at 151.) Mr. Stoitchkov, who had never injured another player in his long and storied career,

was so upset by the incident that he held his head in his hands and wept. (<u>Id</u>.)

 Neither Mr. Llerena nor his expert witnesses will testify that Mr. Stoitchkov intended to

break Mr. Llerena's leg.  (Llerena Dep. at 91-92.  Ramsey Dep. at 83.  Manella Dep. at 103.)  In

addition, neither Mr. Llerena nor his expert witnesses believe that Mr. Stoitchkov specifically

targeted Mr. Llerena as a player he wanted to take out of the game.  (Llerena Dep. at 91-92.  Ramsey

Dep. at 81.  Manella Dep. at 104-05.)  Mr. Llerena's injury was simply an accident occurring during

a play in a competitive match where two players sought possession of one loose ball in hopes of

advancing it toward their opponent's goal.  Even assuming that Mr. Stoitchkov's play on the ball

was too strong or that he came in too fast; such actions by him would not support an award of

punitive damages.  Mere negligence, indeed gross negligence, cannot be the basis for an award of

punitive damages.  Karraahmetoglu v. Res-Care, Inc., 480 F. Supp. 2d 183, 189 (D.D.C. 2007).  As

such, Mr. Stoitchkov is entitled to summary judgment on Mr. Llerena's claim for punitive damages

in Count IV of his First Amended Complaint.

**B.  Should Mr. Llerena Be Permitted to Submit His Claim for Punitive Damages to Jury, Their Consideration of Punitive Damages Should Be Bifurcated From the Liability Phase of Trial**

Should the Court permit Plaintiff to present his claim for punitive damages against Mr.

Stoitchkov to the jury, that claim should be bifurcated in the interest of justice and to avoid undue

prejudice on Mr. Stoitchkov and the other Defendants during the liability phase of the trial.  Under

Rule 42 of the Federal Rules of Civil Procedure, a court "may order a separate trial of any claim . . .

or separate issue" to further "convenience or to avoid prejudice."  Fed. R. Civ. P. 42.  Where a

plaintiff seeks punitive damages, a court has discretion to bifurcate the trial so that the jury

determines liability and compensatory damages separate from the claim of punitive damages.

Mattison v. Dallas Carrier Corp., 947 F.2d 95, 110 (4th Cir. 1991).

Here, evidence that would go toward a recovery of punitive damages would undoubtedly

inflame and prejudice a jury while considering liability.  In particular, Plaintiff would be allowed to

put on evidence as to Mr. Stoitchkov's ability to pay an award of punitive damages. Such evidence might cloud the jury's objective opinion as to whether Mr. Stoitchkov can be held liable for his actions on the soccer field. Such a result would also harm the other Defendants to this action.

Significantly, unlike some cases in which bifurcation of the claims would be inefficient, because it would require two trials on the same facts resulting in duplicative testimony, this matter is one where a claim for punitive damages would be separate and distinct and would not require duplicative testimony or witnesses.

If the Court is not inclined to bifurcate Plaintiff's punitive damages claim altogether, Defendants request that the Court follow what has become a common practice in handling punitive damages claim. That is to prohibit the admission of evidence as to a defendant's financial ability to pay an award of punitive damages until after the jury has returned a verdict in favor of punitive damages. See, e.g., Id.; Darcars Motors v. Borzym, 841 A.2d 828, 842-43 (2004). A short and specific hearing on the amount of punitive damages can then be held and the jury can be sent out to decide that final remaining issue.

<u>**CONCLUSION**</u>

For all the foregoing reasons, Defendants request that the Court enter summary judgment in their favor on all counts in Plaintiff's First Amended Complaint.  In the alternative, Defendants request that partial summary judgment be entered in favor of (1) D.C. Soccer and AEG as to Counts I, II, and III; (2) MLS as to Count III; and (3) Hristo Stoitchkov as to Count IV.


_____ / s / _____
Daniel R. Lanier
Federal Bar No.: 04504
Brian W. Casto
Federal Bar No.: 28010
MILES & STOCKBRIDGE P.C.
10 Light Street
Baltimore, Maryland  21202
410-727-6464

Attorneys for Defendants

29