**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| A. FREDDY LLERENA-ASPIAZU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 06-343 (RWR) |
| | ) | |
| MAJOR LEAGUE SOCCER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Roger C. Johnson (D.C. Bar #940577)
Andrew W. Cohen (D.C. Bar #441149)
KOONZ, MCKENNEY, JOHNSON,
 DEPAOLIS & LIGHTFOOT, L.L.P.
2001 Pennsylvania Avenue, N.W.
Suite 450
Washington, DC  20006
Tel:  (202) 659-5500

Attorneys for Plaintiff Freddy Llerena

Date:  July 31, 2007

# TABLE OF CONTENTS

Introduction ........................................................................................................1

Facts .................................................................................................................5

Standard of Review .........................................................................................14

Argument .........................................................................................................15

1.    Defendants have failed to meet their burden of showing no genuine issue
      as to any material fact supporting Llerena's negligence and
      reckless-disregard claims ......................................................................15

      A.    Evidence of Stoitchkov's pre-and post-collision tantrum raises
            genuine issues of material fact as to whether he acted in reckless
            disregard for Llerena's safety ....................................................15

      B.    Defendants do not even challenge Llerena's *prima facie* negligence
            claim, arguing only that he assumed the risk, but the applicability
            of that defense is properly for the jury ......................................23

      C.    Whether Stoitchkov was acting as a D.C. United assistant coach
            when he collided with Llerena is a disputed factual question
            precluding summary judgment for D.C. Soccer .........................26

2.    Defendants have failed to meet their burden of showing no genuine issue as to
      any material fact supporting Llerena's negligent hiring, retention,
      and supervision claim ............................................................................27

      A.    No expert testimony is required to support Llerena's negligent
            hiring, retention, and supervision claim .....................................27

      B.    There is evidence that MLS, D.C. Soccer, and AEG knew or should
            have known that Stoitchkov behaved in a dangerous manner and
            failed to adequately supervise him .............................................28

3.    Defendants have failed to meet their burden of showing no genuine issue
      as to any material fact supporting Llerena's punitive-damages claims ...............29

      A.    The record is replete with evidence that Stoitchkov acted with the
            malice required to prove punitive damages ................................29

      B.    If Llerena's punitive-damages claim is allowed to proceed, there is
            no basis for bifurcating it from the liability and compensatory-
            damages phase of the litigation ..................................................32

Conclusion .......................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................14

*Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195 (D.C. 1991)................................27

*Bentley v. Cuyahoga Falls Bd. of Ed.*, 709 N.E.2d 1241 (Ohio Ct. App. 1998) ......... 18-20

*Brisbin v. Washington Sports and Entertainment, Ltd.,*
    422 F. Supp. 2d 9 (D.D.C. 2006) ........................................................................28

*Caldwell v. District of Columbia*, 201 F. Supp. 2d 27 (D.D.C. 2001)........................ 32-33

*Campbell v. ACandS, Inc.*, 704 F. Supp. 1020 (D. Mont. 1989) ....................................33

*\*Cunningham v. District of Columbia Sports and Entertainment Comm'n,*
    No. Civ.A. 03-839RWRJMF,
    2005 WL 3276306 (D.D.C. Nov. 30, 2005) ............................ 4, 14, 20, 24, 30-31

*Czekalski  v. Peters*, 475 F.3d 360 (D.C. Cir. 2007)........................................................14

*District of Columbia v. Carlson*, 793 A.2d 1285 (D.C. 2002).........................................20

*District of Columbia v. Hampton*, 666 A.2d 30 (D.C. 1995)...................................... 27-28

*Giles v. Shell Oil Corp.*, 487 A.2d 610 (D.C. 1985)........................................................27

*Greer v. Davis,* 921 S.W.2d 325 (Tex. Ct. App. 1996) ................................................ 2-3

*Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d 516 (10th Cir. 1979)..............................18

*Hutchinson v. Stuckey*, 952 F.2d 1418 (D.C. Cir. 1992)...................................................32

*Knippen v. Ford Motor Co.*, 546 F.2d 993 (D.C. Cir. 1976) ............................................30

*Krombein v. Gali Serv. Indus., Inc.*, 317 F. Supp. 2d 14 (D.D.C. 2004) .........................24

*Laurin v. Pokoik*, No. 02 Civ. 1938(LMM),
    2005 WL 911429 (S.D.N.Y. Apr. 18, 2005)......................................................33

*Lestina v. West Bend Mut. Ins. Co.*, 501 N.W.2d 28 (Wis. 1993) ......................................3

*Lipnick v. United States*, 717 F. Supp. 902 (D.D.C. 1989)..............................................24

*\*Mark v. Moser*, 746 N.E.2d 410 (Ind. Ct. App. 2001).......................................... 2, 16-17

*Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33 (D.D.C. 2003) .................................... 29-30, 31

*Morgan v. District of Columbia*, 449 A.2d 1102 (D.C. 1982).........................................28

*Morrison v. MacNamara*, 407 A.2d 555 (D.C. 1979) .......................................................24

*Nabozny v. Barnhill*, 334 N.E.2d 258 (Ill. Ct. App. 1975) ...........................................2, 20

*Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813 (D.C. 1991) ..................30

*O'Neil v. Bergan,* 452 A.2d 337 (D.C. 1982) ...................................................................27

*Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley*,
    999 F. Supp. 34 (D.D.C. 1998) ...............................................................................24

*Qutb v. Ramsey*, 285 F. Supp. 2d 33 (D.D.C. 2003).........................................................30

*Rogers v. Ingersoll-Rand Co.*, 971 F. Supp. 4 (D.D.C. 1997) .........................................30

*\*Sieber v. Wigdahl*, 704 F. Supp. 1519 (N.D. Ill. 1989)................................... 2, 16, 20-21

*Stager v. Schneider*, 494 A.2d 1307 (D.C. 1985) ............................................................24

*Smith v. Poughkeepsie City Sch. Dist.*,
    --- N.Y.S.2d ---, 2007 WL 1703708 (N.Y. App. Div. June 12, 2007)..................29

*Town Center Mgmt. Corp. v. Chavez*, 373 A.2d 238 (D.C. 1977)....................................32

## OTHER AUTHORITIES

Restatement (Second) Torts § 500 (1965) .........................................................................22

Restatement (Second) Torts § 500, cmt. f (1965) ..............................................................18

## Introduction

This case is about a promising, local collegiate soccer player who was permanently injured, and whose soccer career was destroyed, by the reckless conduct of a professional soccer player during a meaningless, "friendly," exhibition match.  On March 25, 2003, American University freshman Freddy Llerena, Jr.'s tibia and fibula were snapped in half by D.C. United's Hristo Stoitchkov, a temperamental, veteran European footballer.  Stoitchkov exploded over a disputed offsides call that led to an A.U. goal and then proceeded to take out his anger and frustration on Llerena.

Specifically, immediately after the A.U. goal, Stoitchkov launched a profane tirade at the assistant referee, who Stoitchkov felt had failed to call offsides.  Still visibly angry and vocal when play resumed less than a minute after the A.U. goal, Stoitchkov ran towards Llerena from a distance as Llerena attempted to collect the ball that had just been passed towards him.  With cleats raised dangerously high, Stoitchkov crashed into Llerena, bringing his left foot down on Llerena's right leg, breaking it in two.  A former D.C. United coach present at the game who witnessed the lead-up to the incident said it appeared that Stoitchkov "clearly wanted to make a statement."

Stoitchkov immediately received a red card from the referee, ejecting him from the game.  Still visibly upset and uttering profanities, Stoitchkov got up from the ground and walked past the assistant referee.  As Stoitchkov left the field of play, perhaps to make sure the message was received, Stoitchkov told the assistant referee to "f*** off."

Defendants portray the incident as within the normal course of play and therefore not actionable under the jurisprudence that has developed for claims arising out of injuries incurred on the playing field.  But neither the law nor the facts of this case are as

narrow as Defendants suggest. Courts have long recognized that "the law should not place unreasonable burdens on the free and vigorous participation in sports," but they have also understood that "organized athletic competition does not occur in a vacuum. Rather, some of the restraints of civilization must accompany every athlete onto the playing field." *Nabozny v. Barnhill*, 334 N.E.2d 258, 260 (Ill. Ct. App. 1975).

In finding injuries incurred on the playing field actionable, a few jurisdictions have adopted a simple negligence standard, although the vast majority of jurisdictions have adopted a recklessness standard. There are no reported decisions from the D.C. Court of Appeals addressing the question of which standard of care applies in the District of Columbia. In ruling on Defendants' summary judgment motion, however, the Court need not decide that question at this time. For there is ample evidence in the record to establish the existence of genuine issues of material fact that make summary judgment for Defendants inappropriate and unwarranted under either the lower negligence standard or the higher reckless-disregard standard.

Myriad courts facing the same type of contact-sports-injury claims brought here have, in the face of disputed factual issues, denied defendants' summary-judgment motions and allowed those claims to proceed to trial. *See, e.g.*, *Sieber v. Wigdahl*, 704 F. Supp. 1519 (N.D. Ill. 1989) (genuine issue of material fact existed as to whether polo player's action in colliding with another player's horse during match was taken with reckless disregard for other player's safety); *Mark v. Moser*, 746 N.E.2d 410 (Ind. Ct. App. 2001) (affirming trial court's finding that genuine issue of material fact precluded summary judgment on count to recover damages for participant's reckless conduct in causing bicycle collision during triathlon); *Greer v. Davis,* 921 S.W.2d 325 (Tex. Ct.

App. 1996) (finding that genuine issue of material issue of fact existed as to whether collision between base runner and player tagging him in softball game was result of base runner's reckless conduct); *see also Lestina v. West Bend Mut. Ins. Co.*, 501 N.W.2d 28 (Wis. 1993) (applying negligence standard and affirming verdict holding liable soccer goalkeeper in adult recreational league who allegedly "slide-tackled" and injured opposing player as he advanced with ball toward goal).  As set forth herein, Defendants have failed to meet their burden of showing the absence of any genuine issue of material fact.  Extensive evidence shows that Stoitchkov's mercurial state of mind fueled his collision with Llerena on the field, making summary judgment on Llerena's negligence and reckless-disregard claims inappropriate and unwarranted.

Defendants Anschutz D.C. Soccer, L.L.C. ("D.C. Soccer") and Anschutz Entertainment Group, L.L.C. ("AEG") – the owners of D.C. United – also seek summary judgment on Llerena's negligence and reckless-disregard claims on the grounds that they cannot be held vicariously liable for Stoitchkov's actions.  Stoitchkov both played for and served as an assistant coach of D.C. United.  But Defendants contend that, because only Major League Soccer ("MLS") employed Stoitchkov as a player – the capacity in which Defendants contend he injured Llerena – neither D.C. Soccer – which employed Stoitchkov only as an assistant coach – nor AEG – the corporate parent of D.C. Soccer – can be held liable.  But from Llerena's perspective, those are distinctions without a difference, and the roles are not separable, as Defendants suggest.  Indeed, Stoitchkov acknowledged that he retained his assistant-coach role even when he was playing in a game.  Thus, those who employed Stoitchkov as either a player or assistant coach – MLS and D.C. Soccer – are responsible for his actions on the field.

Defendants also contend that Llerena's negligent hiring, retention, and supervision claim must fail because he has provided no expert testimony on the standard of care for the hiring, retention, or supervision of a professional soccer player. But recognizing when someone with a lengthy history of volatile on-field behavior presents a risk to others is not beyond the ken of the average layperson. And although Defendants attempt to downplay that history, its existence is not disputed and creates a jury question.

Finally, Defendants seek summary judgment on Llerena's punitive-damages claim. But the question of whether Stoitchkov is liable for punitive damages properly is one for the jury. As this Court has recognized, summary judgment on the issue of whether a defendant acted with the malice required to support a punitive-damages award is "rarely appropriate." *Cunningham v. District of Columbia Sports and Entertainment Comm'n*, No. Civ.A. 03-839RWRJMF, 2005 WL 3276306, at *10 (D.D.C. Nov. 30, 2005) (internal quotation marks and citation omitted) . Here, Stoitchkov's exceptionally aggressive attack on Llerena, viewed in light of his profane tirade immediately before and after the collision, provides sufficient evidence of malice to warrant allowing the punitive-damages question to go to the jury.

# Facts[1]

Before graduating in 2002, Freddy Llerena was a standout soccer player at Northwest High School in Germantown, Maryland.  Llerena – who had moved to the United States from Quito, Ecuador when was five years old – was team captain for his last two years at Northwest, and, among other awards, was selected to the All State and All Region teams by the National Soccer Coaches Association of America (Llerena Dep. 26:2-7; 33:6-9; and 35:16 to 36:13) (relevant portions of all cited deposition transcripts are attached hereto as Exhibits 1- 6.)

Llerena was recruited to play collegiate soccer at American University in Washington, D.C. by the team's head coach, Todd West.  (West Dep. 17:13-17) (Exhibit 2.)  Although Llerena received at least one other scholarship offer, he knew that he wanted to attend American University, which he considered to have a good business program (his intended field of study) and "a great soccer program."  (Llerena Dep. 39:9-21; 40:21.)

According to Coach West, Llerena was a highly skilled player:  "His feet were better than almost every kid in high school, especially in this area.  He could do things

---

[1] Defendants' summary-judgment motion includes both a separately filed "Statement of Material Facts" and a section in their Memorandum in Support entitled "Statement of Undisputed Material Facts."  But the Statement of Undisputed Material Facts in Defendants' Memorandum in Support includes many more references to the record than appear in their separate Statement of Material Facts.  And, the Statement of Undisputed Material Facts in the Memorandum in Support does not cite to or cross reference the separate Statement of Material facts required by Local Rule 7(h).  Consistent with Local Rule 7(h), Plaintiff understands Defendants to be relying in support of their motion only on those purportedly undisputed material facts set forth in their separately filed Statement of Material Facts.  For the Court's convenience, below, Plaintiff cites to and cross references the disputed material facts set forth in his separate Statement of Genuine Issues.  Additional record references herein provide helpful background for the Court, but Plaintiff does not rely on them in opposing Defendants' motion.

that most kids couldn't do with the ball." (West Dep.17:18 to 18:3.) In his first season at American University, Llerena started one game, was the first player off the bench, and was relied upon heavily by the team's coaches. (Llerena Dep. 43:17-18; 44:9-16.)

In his prime, Hristo Stoitchkov, a native of Bulgaria, was considered one of the best soccer players in the world. (Stoitchkov Dep. 8:18-20; 55:17-21) (Exhibit 3.) Even at the age of thirty-seven, while finishing out his career in the United States with MLS, Stoitchkov was considered one of the league's top players. (Clement Dep. 71:5-12) (Exhibit 4.) Among his noteworthy soccer skills, Stoitchkov was "very fast" and "excellent at controlling the ball," able "to see the field well" and "anticipate where the ball was going," and could "take the ball from other players." (Plf.'s Statement of Genuine Issues ¶ 1.A ("Genuine Issues") (Stoitchkov Dep. 56:2 to 57:7).)

Stoitchkov's lengthy experience and acclaim as a soccer player led D.C. United to utilize him as both a player and as an assistant coach. Although Stoitchkov was employed by MLS only as a player and by D.C. Soccer only as an assistant coach, his roles merged when stepped on the playing field. According to Stoitchkov, on the field, he was a "play[er] first," but also the "assistant coach inside the field," where he would communicate concerns from the head coach to the other players. (*Id*. ¶ 8.A (Stoitchkov Dep. 53:11 to 54:6).)

In addition to being a tremendously skilled soccer player, Stoitchkov was a highly volatile and temperamental player. Among the nicknames he acquired over the years were "the Dagger," "the Mad Bulgarian," and "the Raging Bull." (*Id*. ¶ 1.B (Stoitchkov Dep. 173:16 to 174:10).)

Stoitchkov has acknowledged his temper on the field, and that it came from his desire to win: "[M]y blood is to win, my mentality only to win." (*Id.* ¶ 1.C (Stoitchkov Dep. 167:1-4).) Indeed, with respect to his on-field ferocity, Stoitchkov has explained: "I will tell you one thing, whether I have black hair or white hair, *the mad boy will live inside me forever*. . . . [M]y ambition will never subside. I do have to admit that since I moved to the U.S. I have become more settled, even calm. *But when it comes down to winning, I instantly explode.* It doesn't matter if I am fishing, golfing *or playing a small side match*." (*Id.* (Stoitchkov Dep. 168:2-17) (emphasis added).)

Among his more notable temper-based infractions, in 1985, Stoitchkov received a lifetime ban (later rescinded) for his part in a brawl during the Bulgarian Cup finals as a member of CSKA Sofia; in 1991, he received a six-month suspension for stomping on a referee's foot during a protest (later reduced to ten games);[2] and while playing for F.C. Barcelona of Spain, he received a record eleven red cards in a single season. (*Id.* ¶ 2.B (Stoitchkov Dep. 36:9-11; Llerena Dep. 72:16-20).)[3] In 2000, while playing for another MLS team, Stoitchkov received a red card for tackling Kansas City Wizards mid-fielder Mo Johnston from behind. Stoitchkov was "mad" at him, and afterwards stood over him "face in face." (Stoitchkov Dep. 175:9 to 176:16.)

Prior to the incident at issue here, Llerena had no knowledge of Stoitchkov's reputation as a temperamental player on the field; he only knew of his skill. Llerena

---

[2] Defendants characterize Stoitchkov as having "stepped" on the referee's foot. (Defs.' Mem. Supp. Summ. J. at 4.) But in questioning Freddy Llerena at his deposition, counsel for Defendants more accurately asked him: "Were you ever aware that prior to this incident [Stoitchkov] *stomped* on a referee's foot while playing for Barcelona?" (Llerena Dep. 72:12-14) (emphasis added).

[3] A "red card" is "shown by the referee to a player being sent off the field for a flagrant foul." http://dictionary.reference.com/browse/red%20card.

viewed Stoitchkov as an "admirable" figure, even a "hero." (Genuine Issues ¶ 2.B (Llerena Dep. 71:15-21).). Llerena had no knowledge of Stoitchkov's aforementioned infractions. (*Id*. (Llerena Dep. 72:1-20).) Accordingly, Llerena had no apprehension about stepping onto the field with Stoitchkov; rather, Llerena was "honored" to be able to do so. (*Id*. (Llerena Dep. 73:4-10).)

When Llerena stepped onto the field with Stoitchkov, it was for an exhibition match – or a "friendly," as the game is known in soccer parlance. In the soccer community, there are certain expectations for a friendly. (*Id*. ¶ 3.A (Chapin Dep. 58:4-6) (Exhibit 5).) The foremost concern is that no one gets injured. (*Id*. (Chapin Dep. 58:18-19).) From the professionals' perspective, they have careers and salaries at stake. From the collegiate players' perspective, they are trying to improve their games and "don't want anything to happen to them before they get a chance to perform for their team." (*Id*. (Chapin Dep. 58:19 to 59:12); *see also id*. (Manella Dep. 113:16-114:4 (explaining that, in friendly game, "nobody wants to get hurt"; players "are out to play and display their skills")) (Exhibit 6).)

Defendants' expert Nathan Clement – an MLS referee – described soccer matches in terms of their "temperature." (*Id*. ¶ 3.B (Clement Dep. 59:17 to 61:4).) According to Clement, "temperature" is "a sort of slang term that referees use for how hot a match is, how much intensity is going on in a match." (*Id*. (Clement Dep. 59:17-20).) As a general rule of thumb, "a friendly match is at the low or cool end of the thermometer and . . . a World Cup final would be at the high or hot end." (*Id*. (Clement Dep. 62:6-11).) "[G]enerally, with a lower temperature match you would expect less injuries at the end of it." (*Id*. (Clement Dep. 66:9-11); *see also id*. (Manella Dep. 115:8-17 (explaining that

"intensity is going to be much higher at a conference game or a professional game where there's something important" at stake, whereas in "[a] friendly, you get nothing.  You're getting exposure and a chance to go out and warm up and play before the season or so the coach can see the players.")).)

In the friendly between American University and D.C. United played on March 25, 2003, D.C. United scored first and then American University scored a tying goal. Stoitchkov protested to the assistant referee that the A.U. goal was scored while an A.U. player was offsides, but Stoitchkov was the only player or coach at Reeves Field that day to do so.  No other D.C. United player or D.C. United coach protested or voiced any disagreement to the officials that the goal was offsides.  (*Id*. ¶ 4.B (Stoitchkov Dep. 115:15 to 116:7); *id*. ( Summary of Witness Conversations with MLS Disciplinary Committee on March 28, 2003 at 1 (hereinafter "MLS Witness Summaries") (Exhibit 7).)[4]  Indeed, former D.C. United coach Thomas Rongen, who was present at the game, told the MLS Disciplinary Committee investigating the incident that it looked like a "very clean" goal.  (*Id*. ¶ (MLS Witness Summaries at 1).)

Nevertheless, after the goal was scored, Stoitchkov proceeded back up the field towards the bench side to confront the assistant referee, Ken Kaplan.  (*Id*. ¶ 4.C (Chapin Dep. 33:2-6).)  According to Kaplan, Stoitchkov "dissented toward [him] verbally and with gestures."  (*Id*. (MLS Witness Summaries at 1).)  Although Stoitchkov stayed several yards away from Kaplan, Stoitchkov was extremely profane and abusive. According to Kaplan:  "He (Stoitchkov) said, 'That's f***ing wrong, f***ing awful, you

---

[4] On March 28, 2003, three days after the match, the MLS Disciplinary Committee conducted a series of witness interviews by telephone.  The witness's statements were written up by MLS in the document that is attached hereto as Exhibit 7.

need to get them f***ing right, f*** you.'"  (*Id*. (MLS Witness Summaries at 1).)  D.C.

United head coach Ray Hudson told the Disciplinary Committee that Stoitchkov was

"very animated and upset at" the assistant referee.  (*Id*. (MLS Witness Summaries at 2).)

Coach West, who was thirty yards away from Stoitchkov, heard him yelling from that

distance, dropping "[a] lot of F bombs.  Get the calls right.  He was f-ing offsides."  (*Id*.

(West Dep. 38:1-8).)  The referee, Andrew Chapin, who witnessed Stoitchkov arguing

with the assistant referee, testified that he "could see that [Stoitchkov] was gesticulating

and based on his body movements that he clearly was upset."  (*Id*. (Chapin Dep. 33:13-

15).)  Even Stoitchkov, who at first denied under oath that he cursed at the assistant

referee, when pressed admitted that "maybe" he did so.  (*Id*. (Stoitchkov Dep. 119:6-15).)

Kaplan, the assistant referee, did not give Stoitchkov a yellow card for dissenting

because he was not empowered to do so; "[t]he only official on the field with the

authority to sanction players is the referee."  (*Id*. ¶ 4.D (Chapin Dep. 33:18-21).)

Play restarted within no more than thirty seconds of the ball crossing into the D.C.

United goal.  (*Id*. ¶ 4.E (Chapin Dep. 32:5-10).)  But even after play resumed, Stoitchkov

continued to complain about the no-offsides call.  Stoitchkov received the ball and kicked

it "long" into the corner at American University's end of the field.  (*Id*. (Stoitchkov Dep.

120:10-19).)  According to Coach West, Stoitchkov remained "so pissed off he kicked

the ball into the corner so that he would have more time to turn around and yell at the

assistant referee."  (*Id*. (West Dep. 39:6-9).)  Although West heard Stoitchkov yelling, he

was unable to make out what he said because of the noise from commentary about

Stoitchkov's surprising conduct by members of the A.U. team nearby along the sidelines:

"Why doesn't he just get on with the game?  There's 80 minutes left, and it's a friendly."

(*Id.* (West Dep. 39:15 to 40:1).)  Yet Stoitchkov "was yelling and screaming."  (*Id.* (West

Dep. 40:1-2); *see also id.* (Llerena Dep. 83:18-19 ("From the time [Stoitchkov] kicks it,

he yells at the referee some more.")).)[5]

The collision occurred no more than twenty or thirty seconds from the restart of

play following the A.U. goal.  (*Id.* ¶ 5.A (Chapin Dep. 32: 1-4).)  There wasn't "any

doubt" in Chapin's mind that, when the collision occurred, Stoitchkov was still "upset

and angry about the goal that AU had scored and the circumstances of that goal" less than

a minute earlier.  (*Id.* (Chapin Dep. 61:6-12).)[6]

After Stoitchkov's long kick into the corner, the ball was immediately returned in

Llerena's direction.  As Llerena attempted to control the ball, Stoitchkov was running

towards Llerena "in a manner that didn't really make any sense in any way of trying to

pressure the ball" given the A.U. team's position on the field.  (*Id.* ¶ 5.B (West Dep.

40:14-20).)  According to Chapin, Stoitchkov "came from a significant distance at full

speed."  (*Id.* (Chapin Dep. 62:14-17).)  According to former D.C. United head coach

Rongen, Stoitchkov took a "30 yard run at the kid."  Before Stoitchkov even got there,

Rongen "thought, 'oh f***.'"  Rongen had no doubt that Stoitchkov was bracing himself

as he went in because he knew there would be contact and that Stoitchkov "clearly

wanted to make a statement."  (*Id.* (MLS Witness Summaries at 1).)  Chapin similarly

"felt like [Stoitchkov's] destination, his final destination in terms of location was not the

exact spot on the field where the ball was, that he intended to keep going past the ball,"

---

[5] Stoitchkov denied that he spoke to the referee after kicking the long ball, (Stoitchkov
Dep. 121:4-7), but there is no testimony disputing the material fact that Stoitchkov
continued to yell and scream after kicking the long ball, albeit perhaps, in Stoitchkov's
mind, not *at* the assistant referee.

[6] Counsel for Defendants objected to the question preceding this testimony.

which was inconsistent with attempting merely to dispossess the opposing player of the ball.  (*Id*. (Chapin Dep. 64:6-17).)  Stoitchkov went into Llerena with his cleats raised, (*id*. (Stoitchkov Dep. 125:21 to 126:1)), and knew that he was going to collide with Llerena.  (*Id*. (Stoitchkov Dep. 129:9-11).)

Llerena went towards the ball, turned his head, and saw Stoitchkov coming at him, but "the next thing" Llerena knew was that he was "on the ground with a bone sticking out of [his] leg."  (*Id*. ¶ 5.C (Llerena Dep. 83:15 to 84:6).)  Llerena was in "[i]ndescribable" pain.  (*Id*. (Llerena Dep. 96:13-14.)  According to Coach West, Llerena was "inconsolable that he was going to have his leg amputated."  (*Id*. (West Dep. 52:14-16).)

Chapin immediately issued Stoitchkov a red card, ejecting him from the game. According to Chapin, as Stoitchkov "was getting off the ground and leaving the field he was still very upset" and Chapin heard Stoitchkov uttering, in a combination of English and what Chapin assumed was Bulgarian, "some profanity" that was "just very loud." (*Id*. ¶ 6.A (Chapin Dep. 46:11-20).)

Stoitchkov walked off the field past the assistant referee Kaplan.  While directly in front of Kaplan, Stoitchkov told Kaplan to "f*** off."  (*Id*. ¶ 6.B (MLS Witness Summaries at 1).)

Following the game, Chapin prepared a Competition Incident Report and sent it to the league office.  (Exhibit 8.)  A Competition Incident Report "will address any sorts of incidents during the game. . . . It's essentially something just to notify the league that something out of the ordinary has happened."  (*Id*. ¶ 7.A (Chapin Dep. 22:16 to 23:13).) Chapin prepared the report without first viewing video of the incident.  (*Id*. (Chapin Dep.

12

25:4-10).)  Defendants' expert Nathan Clement, himself an MLS official, acknowledged

that, given the speed at which play unfolds on the field, a referee may not always

accurately describe an incident in a Competition Incident Report.  (*Id*. (Clement Dep.

48:12-20).)[7]

After reviewing video of the incident, Chapin acknowledged that he "did not have

the best angle for the challenge."  (*Id*. ¶ 7.B (Chapin Dep. 27:1-7).)  He knew at the time

"instinctively it was a sanction[able] offense," but he "wasn't quite sure about the

details."  (*Id*. (Chapin Dep. 27:9-11).)

In preparing the report, Chapin and assistant referee Ken Kaplan disagreed as to

whether Stoitchkov went into Llerena with one foot or two feet raised.  Chapin thought it

was one foot; Kaplan thought it was two.  (*Id*. ¶ 7.C (Chapin Dep. 27:14-20).)  In the

report, Chapin deferred to Kaplan's view, but after watching the video, Chapin realized

that his initial assessment had been correct – Stoitchkov went in with one foot raised.  (*Id*.

(Chapin Dep. 27:20 to 28:2).)

Further, although the Competition Incident Report states that Chapin sent

Stoitchkov off for "serious foul play," (*id*. ¶ 7.D (Chapin Dep. 29:10-11)), after seeing

the video, Chapin testified that he would have described it as "violent conduct" – a more

serious infraction of the rules that is "more of an act of aggression."  (*Id*. (Chapin Dep.

29:16 to 30:17).)  Chapin never cashed his paycheck for refereeing the game because "to

this day [he] feel[s] sickened that [he was] even involved" with the incident.  (*Id*. 57:17-

22.)

---

[7] Counsel for Defendants objected to the question preceding this testimony.

Although Llerena had surgery to repair his leg, went through rehab, and attempted to play soccer again for American University, according to Coach West, after the incident, Llerena was a "different player." "He couldn't do the things he used to do. He was clever with the ball, creative with the ball. He didn't have any of that. And he couldn't move." (West Dep. 55:4-11.) By his junior year, Coach West and the A.U. coaching staff knew that Llerena "wasn't going to be the guy [they] thought was going to be before the injury." (West Dep. 22:19-21.) Llerena left the A.U. soccer team during his senior year. (*Id*. 23:1-4.)

## Standard of Review

Defendants' motion is governed by the familiar summary-judgment standard under Federal Rule of Civil Procedure 56. "Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "must view the evidence in the light most favorable to the nonmoving party (here [Llerena]), draw all reasonable inferences in [his] favor, and eschew making credibility determinations or weighing the evidence." *Id*. (citations omitted). "In deciding whether there is a genuine issue of material fact, the court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record." *Cunningham*, 2005 WL 3276306, at *3.

# Argument

## 1.    Defendants have failed to meet their burden of showing no genuine issue as to any material fact supporting Llerena's negligence and reckless-disregard claims.

Defendants' brief ignores critical facts that elucidate Stoitchkov's pre- and post-collision rage.  Those facts – to the extent they are even disputed – make clear that, especially in the context of a meaningless, exhibition match, a reasonable jury could readily find that Stoitchkov's conduct was negligent or in reckless disregard for Llerena's safety.

### A.    Evidence of Stoitchkov's pre-and post-collision tantrum raises genuine issues of material fact as to whether he acted in reckless disregard for Llerena's safety.

Starting with Llerena's reckless-disregard claim, Defendants' brief is notable less for what it says than what it omits.  Plaintiff does not dispute the basic tenets of soccer to which Defendants point:  soccer is a free-flowing game; possession of the ball is a key aspect; players fight for possession of the ball; tackles are a permissible means of obtaining possession of the ball; and the like.  (Defs.' Mem. Supp. Mot. Summ. J. at 15.) But as Defendants themselves assert, "[w]hat must be examined are [Stoitchkov's] actions leading up to the injury, not the injury itself."  (*Id*. at 18.)  Yet Defendants turn a blind eye to those actions – and Stoitchkov's actions after the injury – which present compelling evidence of his reckless conduct.

First, there is overwhelming evidence that Stoitchkov lost his temper on the field.  Indeed, Stoitchkov has admitted that he has a "mad boy . . . inside" him and that "when it comes down to winning," he "instantly explode[s]."  (Genuine Issues ¶ 1.C.)  His conduct

during the D.C. United-A.U. Eagles friendly was consistent with that self-ascribed description.  Immediately before Stoitchkov trampled Llerena, Stoitchkov voiced loud and profane dissent to the assistant referee's no-offsides call.  (*Id*. ¶ 4.C.)  Stoitchkov continued to yell and shout even after play resumed and after he played a long pass to the corner.  (*Id*. ¶ 4.E.)  Within seconds, as the ball was passed in Llerena's direction, Stoitchkov was running towards him, with speed and force that made no sense in a friendly game or in light of the position of the ball on the field.  (*Id*. ¶ 5.B.)   Stoitchkov "clearly wanted to make a statement."  (*Id*.)  Immediately after colliding with Llerena and snapping his leg in two, Stoitchkov was still incensed with the assistant referee and was still uttering profanities.  (*Id*. ¶ 6.A.)  As Stoitchkov walked off the field after receiving a red card, he went past the assistant referee and told him to "f*** off."  (*Id*. ¶ 6.B.)

Taking these facts as true as the Court must on summary judgment, what more compelling evidence of reckless disregard for Llerena's safety could there be?  It is basic human nature that anger and recklessness go hand in hand.  *See, e.g.*, *Sieber*, 704 F. Supp. at 1524-25 (denying summary judgment on reckless disregard count where defendant polo player's "state of mind" was at issue in causing fatal collision with opposing player).  Stoitchkov's anger fueled a reckless run at Llerena and caused the collision that permanently injured him and destroyed his soccer career.

With the facts that Plaintiff has put forth in mind, it is important for the Court to understand why Stoitchkov's conduct is exceptional and actionable, while other the types of on-field conflict are not.  Under a reckless-disregard standard, "liability will not lie where the injury causing action amounts to a tactical move that is an inherent or reasonably foreseeable part of the game and is undertaken to secure a competitive edge."

*Moser*, 746 N.E.2d at 422. Thus, among moves that would *not* be actionable are where (1) "a baseball pitcher throws the ball near the batter to prevent him from crowding the home plate, and the ball ends up striking the batter and causing injury"; (2) "the defense in a football game strategically 'blitzes' the opposing team's quarterback resulting in injury"; or (3) "where one basketball team is leading by a point and, seconds from the end of the game, a member of that team chooses to foul the opponent when he drives the lane for a 'slam dunk,' thereby forcing him to try to win the game at the free throw line." *Id*.

Stoitchkov's rage-driven collision with Llerena was neither a tactical move nor a reasonably foreseeable part of the game. Referee Andrew Chapin testified that Stoitchkov was still visibly angry when he ran at Llerena, and did so in a manner that was inconsistent with attempting merely to dispossess the opposing player of the ball. (Genuine Issues ¶ 5.B.) To former D.C. United head coach Thomas Rongen, it looked like Stoitchkov "clearly wanted to make a statement." (*Id*.)

That is precisely the type of on-field conduct that a recklessness standard makes actionable. "[I]f a co-participant vents his anger at another player by means of a physical attack, such conduct would be actionable. Instances of such tortious conduct would be where . . . a baseball batter in a fit of anger intentionally flips his bat towards the opposing team's dugout and injures one of the players." *Moser*, 746 N.E.2d at 422. Like a baseball player angrily flipping a bat and injuring another player, an enraged Stoitchkov launched himself toward Llerena, with devastating consequences.

As a matter of law, it is of no consequence that Stoitchkov did not intend to injure Llerena. Defendants' statement that "[n]either plaintiff nor his expert witnesses will

testify that Mr. Stoitchkov intended to break Plaintiff's leg" is a red herring. (Defs.'
Statement of Material Facts at 4.) Under the law of reckless disregard, for an act to be
reckless, it must be intended by the actor even though he does not intend the harm that
results from the act. *See* Restatement (Second) Torts § 500, cmt. f (1965) ("While an act
to be reckless must be intended by the actor, the actor does not intend to cause the harm
which results from it. It is enough that he realizes or, from facts which he knows, should
realize that there is a strong probability that harm may result, even though he hopes or
even expects that his conduct will prove harmless."); *see, e.g.*, *Hackbart v. Cincinnati
Bengals, Inc.*, 601 F.2d 516, 524 (10th Cir. 1979) ("In the case at the bar the defendant
Clark admittedly acted impulsively and in the heat of anger, and even though it could be
said from the admitted facts that he intended the act, it could also be said that he did not
intend to inflict serious injury which resulted from the blow that he struck."). Likewise
here, it is enough that Stoitchkov intended the act of tackling Llerena so violently that he
knew or should have known that there was a strong probability that he might injure
Llerena.

Defendants heavy reliance on another case involving a tackle in a soccer game,
*Bentley v. Cuyahoga Falls Bd. of Ed.*, 709 N.E.2d 1241 (Ohio Ct. App. 1998), is
misplaced. In *Bentley*, the court of appeals affirmed the trial court's grant of summary
judgment for the defendant in a case arising out of an injury during a girls-team high-
school soccer match. Applying the reckless-disregard standard, the appeals court found
no genuine issue of material fact on the question of whether a slide tackle that injured the
plaintiff was foreseeable. *Id*. at 1245 ("[W]e find that reasonable minds could only

conclude that having her legs taken out from under her was not an unreasonable risk in light of the foreseeable conduct of a soccer game.")

*Bentley*, however, is readily distinguishable.  In *Bentley*, there was a "poorly-executed slide tackle" by a girls-team high-school soccer player.  (Defs.' Mem. Supp. Summ. J. at 16 (citing *Bentley*, 709 N.E.2d at 1242).)  With all due respect to "Ellie," the goalkeeper for the Cuyahoga Falls High School team, Hristo Stoitchkov was one of the best professional soccer players in the world, known for his exceptional skill at the game – including his ability to "take the ball from other players."  (Genuine Issues ¶ 1.A.) Unlike Ellie's poorly executed tackle, which the undisputed facts showed occurred in the normal course of a contested, meaningful match, *see Bentley*, 709 N.E.2d at 1242 ("the game was tied three to three with approximately twelve minutes remaining"), the evidence here points to a recklessly executed, cleats-up tackle caused by Stoitchkov's lost temper in the course of a meaningless friendly.  The two situations could not be more different.

Indeed, the markedly different skill levels of the players and the contexts in which the games were played give rise to very different ideas of foreseeable conduct.  As the *Bentley* court noted, and Defendants themselves emphasize in their brief:  "What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, i.e., the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game."  *Id*. at 1243 (internal quotation marks and citations omitted).  Here, there are disputed questions of fact concerning the rules and customs that govern a friendly and the type of conduct that was foreseeable.  (Genuine Issues ¶¶ 3.A, 3.B.)  Surely, although

"wild pitches during the warm-up period before a baseball game" are foreseeable, reckless conduct by skilled veteran during a friendly match is not. *Bentley*, 709 N.E.2d at 1243. In any event, under District of Columbia law, the foreseeability of Stoitchkov's conduct is a factual question for the jury that makes summary judgment inappropriate. *See Cunningham*, 2005 WL 3276306, at *7 ("foreseeability is a question of fact for a jury") (internal quotation marks and citations omitted); *District of Columbia v. Carlson*, 793 A.2d 1285, 1291 (D.C. 2002) ("foreseeability . . . is nearly always a question of fact for the jury") (internal quotation marks and citation omitted).

More on point than *Bentley* is *Sieber v. Wigdahl*, 704 F. Supp. 1519 (N.D. Ill. 1989), a reckless-disregard case that arose out of a fatal polo accident. Like soccer, "[p]olo "is a fast-paced, sometimes dangerous sport," in which "[c]ollisions and falls are not uncommon." *Id*. at 1521. In *Sieber*, the plaintiff's horse fell after the defendant Wigdahl's horse collided with it; the plaintiff fell to the ground, struck his head, and died two days later. *Id*. Under Illinois law, the case was governed by the reckless-disregard standard for contact sports – "'a player is liable for injury in a tort action if his conduct is such that it is either deliberate, willful or with reckless disregard for the safety of another player so as to cause injury to that player, the same being a question of fact to be decided by a jury.'" *Id*. at 1522 n.2 (quoting *Nabozny*, 334 N.E.2d at 260-61).

"[L]ooking at the evidence in the light most favorable to the plaintiff," the *Sieber* court concluded that the plaintiff had "produced sufficient evidence of deliberateness, willfulness, or reckless disregard to survive defendant's motion for summary judgment." *Id*. at 1523. Among the evidence that court considered was the "speed" at which the defendant was "approaching the ball," his failure to make any "attempt to avoid running

into Sieber, although he had an opportunity to take evasive action," and the defendant's knowledge that his horse was striking Sieber's horse in a dangerous and unstable point (the rear end and hind legs behind the saddle). *Id*. at 1523-24. The court concluded that a "jury could find that defendant saw the play developing, saw Sieber approaching the ball, and deliberately rode into Sieber's horse in an attempt to knock the horse over." *Id*. at 1524. Moreover, the court noted, "[t]hat defendant's actions may have been taken only in pursuit of a competitive advantage" did not, as defendant argued, "mandate denial of recovery." *Id*. Finally, the court also considered evidence that there was "bad blood" between Sieber and Wigdahl. *Id*. (referring to deposition testimony cited by defendant that there was no "bad blood" between plaintiff and defendant, but explaining that "plaintiff's contrary evidence must be taken as true for purposes of this motion").

If summary judgment was unwarranted under the facts of *Sieber*, surely it is unwarranted here. Like Wigdahl colliding with Sieber, Stoitchkov knew he was going to run into Llerena. (Genuine Issues ¶ 5.B.) Stoitchkov's conduct was actually worse than Wigdahl's, because it was taken not merely for competitive advantage, but as a vent for Stoitchkov's anger over the no-offsides call. Finally, although there was no bad blood between Stoitchkov and Llerena, Stoitchkov was furious with the assistant referee, fury that he took out on the player closest to him after play resumed – Freddy Llerena.

Defendants go on in their brief to argue the question of whether "a reasonable juror could conclude" that "the tackle that is the subject of this lawsuit . . . was outside the normal course of play." (Defs.' Mem. Supp. Mot. Summ. J. at 15.) The answer to that question, in light of the record in this case, plainly is "yes." There is ample evidence

in the record that Stoitchkov's actions on the field were outside the normal course of play in an exhibition match between professional and collegiate players.

Reasonable jurors could readily conclude that, Stoitchkov, a skilled, veteran, professional soccer player – indeed, one of the best in the world – knew or had reason to know "not only that his conduct create[d] an unreasonable risk of physical harm to" Llerena, but also that the risk "was substantially greater than that which is necessary to make his conduct negligent."  Restatement (Second) Torts § 500.  Stoitchkov's own words create a question of fact for the jury, admitting that he has such a temper that he will "instantly explode," even "in a small side match."  (Genuine Issues ¶ 1.C.)

Reasonable jurors would be assisted in their task by testimony from Plaintiff's expert Arnold N. Manella, a National Assessor and State Referee Instructor for the United States Soccer Federation, with extensive refereeing experience at the collegiate and professional levels.  Manella has opined in this matter that Stoitchkov's conduct "was outside the scope of normal and acceptable play" by virtue of his "coming in at Llerena from a distance, at speed, with his leg raised high and cleats exposed."  (Rule 26(a)(2) Disclosure of Expert Testimony of Arnold N. Manella at 1.)

Defendants characterize the incident as Stoitchkov using "his extraordinary speed and exceptional skill to aggressively challenge for possession of a poorly-played and loose ball."  (Defendants' Mem. Supp. Mot. Summ. J. at 18.)  But a reasonable juror could easily conclude otherwise – that a player of Stoitchkov's speed, skill, and experience could readily have taken the ball from Llerena without harming him if only Stoitchkov had the presence of mind to do so.  (*See* Genuine Issues ¶ 1.A.)  As Manella explained, "a professional player like Stoitchkov knows what he has to do physically to

control that ball," but in this circumstance he did not. (Manella Dep. 85:12-14.) When "[y]ou are a top level athlete, and when you want to collect the ball or you want to turn a player away from the ball, you've got [the] attributes to do that." (*Id*. 101:13-16.)

Rather, as the video of the incident and a series of twenty still frames taken from the video (attached hereto as Exhibit 9) show, "instead of closing on the ball," Stoitchkov "extend[ed] his body and actually launch[ed] himself kind of forward planting his right foot" and extending his left foot "probably waist high, cleats up." (*Id*. 66:5-9.) When Llerena realized that he did not have possession of the ball when it popped up, "[h]e starts to drop his foot to reconnect with the ball. Stoitchkov's leg does not drop with the ball but, rather, continues on through Llerena's leg." (*Id*. 66:10-15.) In other words, "Stoitchkov's leg and foot did not follow the ball as it came to the ground." (*Id*. 71:1-4.) That was "not a move you expect a professional player to make," (*id*. 86:7-8), especially one of the best professionals on the planet. In sum, as Manella concluded, "Stoitchkov decided not to play the ball, [he] decided to play the player to send a message, and instead of just sending him a message, he injured the player." (*Id*. 103:16-19.) That is the essence of reckless conduct on the playing field.

**B.    Defendants do not even challenge Llerena's *prima facie* negligence claim, arguing only that he assumed the risk, but the applicability of that defense is properly for the jury.**

Were the Court to apply the negligence standard to Llerena's claims, Defendants implicitly acknowledge that Llerena's *prima facie* negligence claim cannot be defeated on summary judgment. Defendants argue only for summary judgment on their affirmative defense of assumption of the risk. (*See* Defs.' Mem. Supp. Mot. Summ. J. at 11-13 & n.4.) But there is no basis for summary judgment on that defense.

This Court has recognized that, as an affirmative defense to a negligence claim, assumption of the risk is extremely difficult to establish on summary judgment. "The doctrine of assumption of the risk is a 'heavily fact-based inquiry' that is usually for the jury." *Cunningham*, 2005 WL 3276306, at *5 (quoting *Krombein v. Gali Serv. Indus., Inc.*, 317 F. Supp. 2d 14, 20 (D.D.C. 2004)). Indeed, "[a] court should grant summary judgment only if no real dispute exists as to the plaintiff's awareness and full comprehension and appreciation of the danger." *Id.* (citing, *inter alia*, *Krombein*, 317 F. Supp. 2d at 20). "The plaintiff must *subjectively* know[] of the existence of the risk and appreciate[] its unreasonable character." *Id.* (internal quotation marks and citations omitted) (emphasis in original). Additionally, a plaintiff must "'voluntarily expose[] himself to [the known risk]'" in order for an assumption-of-the-risk defense to operate. *Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley*, 999 F. Supp. 34, 57 (D.D.C. 1998) (quoting *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985) (further citations and internal quotation marks omitted)); *see also Lipnick v. United States*, 717 F. Supp. 902, 908 (D.D.C. 1989) (stating assumption-of-the-risk defense "applies 'in situations when a plaintiff who is aware of the risk created by the defendant's negligence *deliberately chooses* to encounter that risk'") (quoting *Morrison v. MacNamara*, 407 A.2d 555, 566 (D.C. 1979) (emphasis added)).

Defendants posit, incorrectly, that the "danger" here was that of injury – any injury – on the soccer field. They point to Llerena's acknowledgment that, as a contact sport, soccer carries with it the risk of injury in the ordinary course of play. (*See* Defs.' Mem. Supp. Mot. Summ J. at 13 n.4.) Indeed, in the ordinary course of an ordinary game, soccer players tackle each other while going for the ball; they sometimes kick each

other; they suffer pulls and sprains and other assorted injuries. The risk of those sorts of injuries was plainly the risk to which Llerena was referring.

But the risk of injury that Stoitchkov caused Llerena was one whose existence and unreasonable character Llerena subjectively did not appreciate, and did not assume, for two principle reasons. First, the match between D.C. United and American University was a friendly. The game was merely a scrimmage; it didn't count towards anything. Although it might have been a competitive match – surely, neither D.C. United nor American University could reasonably have been expected to roll over in front of their fans who gathered at Reeves Field – it was nonetheless, as Defendants' expert put it, expected to be a "low temperature" affair. (Genuine Issues ¶ 3.B.) The foremost concern in the minds of the players and coaches was to avoid injury. (*Id*. ¶ 3.A.) In that context, Llerena could not reasonably have expected an experienced professional player to become unhinged over a disputed offsides call and resume play in a manner that would seriously injure him. That view was echoed by the other members of the A.U. team who, upon watching Stoitchkov self-destruct on the field, were heard commenting from the bench: "Why doesn't he just get on with the game? There's 80 minutes left, and it's a friendly." (*Id*. ¶ 4.E.)

Second, Llerena lacked knowledge that Stoitchkov might erupt even in a friendly. Although Llerena knew of Stoitchkov and even admired his skill as a player, (*id*. ¶ 2.B), Llerena had no knowledge of Stoitchkov's darker side, as reflected by the nickname the "Mad Bulgarian" and other nicknames he acquired in Europe; his involvement in a brawl during the Bulgarian Cup finals; his stomping on a referee's foot over a disputed call; and his record eleven red cards during a single season playing in Spain. (*Id*.)

In short, summary judgment on Defendants' assumption-of-the-risk defense to Llerena's negligence claim is unwarranted because (1) admissible evidence shows that Llerena was not subjectively aware of the relevant risk, *i.e.*, injury from an enraged Stoitchkov during a friendly match, (2) Llerena did not subjectively appreciate its unreasonable character, and (3) Llerena did not deliberately choose to encounter that risk.

For all the preceding reasons, the Court should deny Defendants' motion for summary judgment on Llerena's negligence and reckless-disregard claims.

**C.    Whether Stoitchkov was acting as a D.C. United assistant coach when he collided with Llerena is a disputed factual question precluding summary judgment for D.C. Soccer.**

D.C. Soccer asserts that, because Stoitchkov was employed by MLS only as a player, and by D.C. Soccer only as an assistant coach, D.C. Soccer cannot be held liable for Stoitchkov's actions on the field of play.  But there is a genuine issue of material fact on this point that precludes summary judgment for D.C. Soccer.  Stoitchkov himself has testified that he retained his assistant-coach role when he was playing.  According to Stoitchkov, on the field, he was a "play[er] first," but also the "assistant coach inside the field," where he would communicate concerns from the head coach to the other players. (Genuine Issues ¶ 8.A.)  In other words, Stoitchkov did not step out of his coach's shoes and into his player's shoes when he walked onto the field; rather, his roles merged. Stoitchkov's testimony therefore precludes summary judgment for D.C. Soccer on Llerena's negligence and reckless-disregard claims.[8]

_____

[8] Llerena concedes that, on the evidence of record, AEG – the parent corporation of D.C. Soccer – cannot be held liable for Stoitchkov's actions, either vicariously or in its capacity as a member of D.C. Soccer.

**2.    Defendants have failed to meet their burden of showing no genuine issue as to any material fact supporting Llerena's negligent hiring, retention, and supervision claim.**

**A.    No expert testimony is required to support Llerena's negligent hiring, retention, and supervision claim.**

Defendants attempt to avoid liability for Llerena's negligent hiring, retention, and supervision claim by arguing that he has failed to provide necessary expert testimony to prove the applicable standard of care.  The gravamen of a negligent hiring, retention, and supervision claim under District of Columbia law is that "an employer knew or should have known that its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee."  *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (citation omitted).  There is no need for expert testimony to establish the standard of care for that claim in this context, as this matter falls within the "common knowledge exception."

In *District of Columbia v. Hampton*, the D.C. Court of Appeals explained that the "common knowledge exception" is "a partial exception" to the general rule that expert testimony is required to prove the standard of care.  666 A.2d 30, 35 (D.C. 1995) (citing *O'Neil v. Bergan,* 452 A.2d 337, 342 (D.C. 1982)).  Under the exception, "[w]here negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it."  *Id.* (quoting *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 200 (D.C. 1991)).  In those cases falling within the common-knowledge exception, the D.C. Court of appeals has "refused to require expert testimony when the issue before the jury did not

27

involve either a subject too technical for lay jurors to understand or the exercise of sophisticated professional judgment." *Id.* at 36.  Furthermore, "[t]he decision of whether a plaintiff's failure to proffer an expert opinion merits granting summary judgment is quintessentially a discretionary call of the trial court." *Brisbin v. Washington Sports and Entertainment, Ltd.*, 422 F. Supp. 2d 9, 14 (D.D.C. 2006) (internal quotation marks and citation omitted).

Here, the relevant question is whether MLS, D.C. Soccer, and AEG negligently hired an employee whom they knew, or should have known, behaved in a dangerous manner and failed adequately to supervise him.  That is not a technical assessment and does not require sophisticated professional judgment.  It is not beyond the ken of the average layperson to be able to conclude whether hiring someone with a checkered past of temperamental and volatile behavior on the playing field presents a danger to other players.  *Cf. Morgan v. District of Columbia*, 449 A.2d 1102, 1106, 1109 (D.C. 1982) (stating that expert testimony is not required to establish "standard of care for control and supervision of police officers" because "[d]iscipline of police officers . . . is not a matter which laymen are incapable of intelligently evaluating without the assistance of expert testimony") (internal quotation marks and citation omitted), *reh'g granted and op. vacated on other grounds*, 452 A.2d 1197 (D.C. 1982).  Accordingly, no expert testimony is required in support of Llerena's negligent hiring, retention, and supervision claim.

**B.    There is evidence that MLS, D.C. Soccer, and AEG knew or should have known that Stoitchkov behaved in a dangerous manner and failed to adequately supervise him.**

On the factual question of Defendants' negligent hiring, retention, and supervision of Stoitchkov, Defendants' brief makes Plaintiff's case for him.  The well-documented

incidents of Stoitchkov's temper – the Bulgarian Cup brawl; stomping on a referee's foot; a record number of red cards – all were warning signs that Stoitchkov posed a threat of dangerous behavior on the playing field.  Defendants' arguments that these incidents do not count – for example, based on Stoitchkov's self-serving description of the basis for the infamous Bulgarian Cup brawl – go to their weight, not the question on summary judgment of whether there are factual issues for the jury consider.  *See, e.g.*, *Smith v. Poughkeepsie City Sch. Dist.*, --- N.Y.S.2d ---, 2007 WL 1703708, at *2 (N.Y. App. Div. June 12, 2007) (reversing grant of summary judgment on negligent supervision claim in light of "issues of fact as to whether the defendant [school system] had knowledge of [a student's] dangerous propensities as a result of her involvement in similar altercations with classmates in the recent past").  Accordingly, a genuine issue of material fact exists as to Llerena's negligent hiring, retention, and supervision claim, which precludes summary judgment for Defendants.

### 3.    Defendants have failed to meet their burden of showing no genuine issue as to any material fact supporting Llerena's punitive-damages claims.

#### A.    The record is replete with evidence that Stoitchkov acted with the malice required to prove punitive damages.

Llerena has put forth sufficient evidence to withstand summary judgment on his punitive-damages claim against Stoitchkov.  As this Court has recognized, under District of Columbia law, "[p]unitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury."  *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 52 (D.D.C. 2003) (internal quotation

marks and citations omitted). Looked at another way, a showing of "evil motive or actual malice" is required. *Id.* (quoting *Rogers v. Ingersoll-Rand Co.*, 971 F. Supp. 4, 12 (D.D.C. 1997) (upholding award of punitive damages in products-liability action), *aff'd on other grounds*, 144 F.3d 841 (D.C. Cir. 1998)). Although punitive damages may lie more frequently for an intentional tort, they are appropriate under the law where reckless conduct is alleged: "'[T]he question is whether a defendant's conduct contains elements of intentional wrongdoing or conscious disregard for plaintiff's rights.'" *Cunningham*, 2005 WL 3276306, at *5 (quoting *Knippen v. Ford Motor Co.*, 546 F.2d 993, 1002 (D.C. Cir. 1976)). "Proof of these elements may be inferred from the acts of the defendant and from circumstantial evidence," and "[t]he issue is ordinarily one for the trier of fact." *Mitchell*, 274 F. Supp. 2d at 52 (internal quotation marks and citation omitted). Indeed, this Court has observed that "'[s]ummary judgment on the issue [of whether a defendant acted with malice] is rarely appropriate.'" *Cunningham*, 2005 WL 3276306, at *10 (quoting *Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813, 820 (D.C. 1991) (bracketed material in original)).

Courts routinely deny summary judgment for defendants on punitive-damages claims where the facts showing malice put forth by the plaintiff are credited, as they must be. *See, e.g.*, *Qutb v. Ramsey*, 285 F. Supp. 2d 33, 52 (D.D.C. 2003) (denying summary judgment for defendant on plaintiff's punitive-damages claim in case alleging that towing of automobile was Fourth Amendment seizure and explaining: "Were plaintiff's account to be credited, it would not necessarily be unreasonable for a jury to conclude that the officers' decision to tow the car was recklessly indifferent to plaintiff's Fourth Amendment right to be free from unreasonable seizures."). In *Cunningham*, where the

plaintiff alleged that he was injured during the HFStival held at RFK Stadium, this Court denied defendants' motion for summary judgment on plaintiff's punitive-damages claim, explaining: "Here, it is possible that an inference that the defendants' conduct was outrageous and evinced an evil motive reasonably could be drawn from evidence of defendants' lack of preparation, emergency planning and crowd management in light of information available to the defendants and the industry." *Cunningham*, 2005 WL 3276306, at *10; *see also Mitchell*, 274 F. Supp. 2d at 52 ("At this point, a genuine issue of material fact exists about whether Diamond acted out of ill will or willfully disregarded plaintiffs' rights.").

Here, a reasonable jury could conclude that Stoitchkov acted with the requisite ill will to support a punitive damages award. Indeed, although permissible, there is no need even for a reasonable jury to rely solely on inferential or circumstantial evidence of "a state of mind evincing malice or its equivalent." *Cunningham*, 2005 WL 3276306, at *5 (internal quotation marks and citation omitted). There is direct evidence of Stoitchkov's state of mind in the record – his profane tirade at the assistant referee, which both preceded and followed the collision with Llerena.

Defendants point to two allegedly mitigating factors, but both miss the mark. First, although there was no "prior altercation" between Stoitchkov and Llerena, (Defs.' Mem. Supp. Summ. J. at 26), Stoitchkov nevertheless was angry at and had argued with, the assistant referee. Unfortunately for Llerena, he became the outlet for Stoitchkov's frustration. Similarly, Defendants assert a lack of malice based on Stoitchkov's demeanor after the play, pointing toward the lack of any taunting or aggressive gesticulations directed at Llerena. (*Id*. at 26.) But Defendants overlook that Stoitchkov

continued to swear and appear upset, and that he walked past the assistant referee and pointedly told him to "f*** off."  Surely, a reasonable jury could conclude that conduct demonstrates malice.

For all the preceding reasons, genuine issues of material fact preclude a grant of summary judgment for Defendants on Llerena's punitive-damages claim.

**B.     If Llerena's punitive-damages claim is allowed to proceed, there is no basis for bifurcating it from the liability and compensatory-damages phase of the litigation.**

Finally, Defendants argue that, if the Court allows the punitive-damages claim to proceed, it should be bifurcated from the liability and damages phase of the litigation. While it is true that a Court has wide discretion to bifurcate a trial, Defendants offer no precedent to support their suggestion that bifurcation would be appropriate here.  It would not.

The evidentiary concerns that Defendants posit are without merit.  Defendants contend that "Plaintiff would be allowed to put on evidence as to Mr. Stoitchkov's ability to pay an award of punitive damages," which "might cloud the jury's objective opinion" on liability.  (Defs.' Mem. Supp. Summ. J. at 27-28.)  But that is merely idle speculation. Indeed, Defendants have "cited no case to support [their] contention that such evidence must be introduced to support an award of punitive damages and the rule appears to be to the contrary."  *Town Center Mgmt. Corp. v. Chavez*, 373 A.2d 238, 246 (D.C. 1977) (citations omitted); *see also Hutchinson v. Stuckey*, 952 F.2d 1418, 1422 n.4 (D.C. Cir. 1992) ("[T]he weight of authority places on *the defendant* the burden of producing evidence of his own financial condition if he wishes it considered by the jury") (emphasis in original) (citations omitted); *Caldwell v. District of Columbia*, 201 F. Supp. 2d 27, 40

(D.D.C. 2001) ("The majority rule in the federal courts is that a defendant who seeks to forestall an award of punitive damages based on his financial condition must present evidence that such an award would be inappropriate for that reason.") (citations omitted).

Rather, bifurcation here would be inconsistent with Federal Rule of Civil Procedure 1, which calls for the "just, speedy, and inexpensive determination of every action." *See, e.g., Laurin v. Pokoik*, No. 02 Civ. 1938(LMM), 2005 WL 911429, at *8 (S.D.N.Y. Apr. 18, 2005) ("Although [the co-defendant] believes that bifurcating the trial would avoid prejudice to it, any prejudice avoided would be minimal in comparison to the strain that bifurcation would place on the expeditious completion of trial."); *Campbell v. ACandS, Inc.*, 704 F. Supp. 1020, 1024 (D. Mont. 1989) (denying motion to bifurcate punitive damages, explaining: "[T]he court is unpersuaded that bifurcation of these issues would promote judicial economy or minimize the risk of a prejudicial verdict. The court is confident that a jury armed with a proper set of instructions to be compiled by the court with the assistance of counsel, will be able to render a fair and impartial verdict with respect to each of the defendants."). Accordingly, the Court should deny Defendants' request to bifurcate the punitive-damages phase of the trial from the liability and compensatory-damages phase.

## Conclusion

For all the preceding reasons, the Court should deny Defendants' motion for summary judgment and allow Freddy Llerena's claims to proceed to trial.

Respectfully submitted,

KOONZ, MCKENNEY, JOHNSON,
 DEPAOLIS & LIGHTFOOT, L.L.P.


By: /s/ Andrew W. Cohen
    Roger C. Johnson (D.C. Bar #940577)
    Andrew W. Cohen (D.C. Bar #441149)
    2001 Pennsylvania Avenue, N.W.
    Suite 450
    Washington, DC  20006
    Tel:  (202) 659-5500

    Attorneys for Plaintiff Freddy Llerena

Date:  July 31, 2007