IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| A. FREDDY LLERENA-ASPIAZU, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:06CV00343 (RWR) |
| MAJOR LEAGUE SOCCER, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Defendants, Major League Soccer, L.L.C. ("MLS"), Hristo Stoitchkov ("Mr. Stoitchkov"), Anschutz D.C. Soccer, L.L.C. ("D.C. Soccer"), and Anschutz Entertainment Group, L.L.C. ("AEG") (collectively "Defendants"), by their undersigned counsel, file this Reply in Support of their Motion for Summary Judgment.

**INTRODUCTION**

Mr. Llerena's Opposition to Defendant's Motion for Summary Judgment (Mr. Llerena's "Opposition") fails to raise any legal or factual basis for denying Defendants' Motion for Summary Judgment. Rather than focus on the play in which he was injured, Mr. Llerena's Opposition obsesses over unrelated events involving Mr. Stoitchkov occurring over 12 years before this incident, nicknames given to Mr. Stoitchkov years ago while he was playing in Europe, and Mr. Stoitchkov's use of the f-word in a dispute with the assistant referee prior to this incident. Certainly, if liability were hinged upon whether Mr. Stoitchkov disputed the assistant referee's decision to not call the American University goal offsides or whether he was notorious for disputing calls by referees during his international playing career in the 1980's to mid-1990's, Mr. Stoitchkov

would be liable. This case, however, is concerned solely with Mr. Stoitchkov's physical actions in making a play for a loose ball during the course of a match. Keeping this in mind, Mr. Llerena can prove no set of facts showing that such conduct was actionable. Defendants are therefore entitled to summary judgment on all counts in Plaintiff's First Amended Complaint.

## ARGUMENT

### A. Mr. Llerena, In His Opposition, Concedes Key Arguments Set Forth In Defendants' Motion for Summary Judgment

At the outset, it is important to note Defendants' arguments not disputed by Mr. Llerena in his Opposition. Either by express concession or by failing to put forth an opposition, Mr. Llerena concedes the following arguments set forth in Defendant's Motion for Summary Judgment:

1. Mr. Llerena expressly concedes that AEG cannot be held vicariously liable for the acts of Mr. Stoitchkov. (Pl.'s Opp'n at 26, n.8.) Mr. Llerena also fails to oppose, and therefore implicitly concedes, that Mr. Stoitchkov was not an employee of AEG. Accordingly, AEG is entitled to summary judgment as to Counts I, II, and III of Plaintiff's First Amended Complaint. (See Defs.' Mem. in Supp. of Mot. for Summ. J. at 19-20, 25.)

2. Mr. Llerena does not oppose, and therefore implicitly concedes, that the heightened recklessness standard, as opposed to mere negligence, is the appropriate standard to apply to Mr. Stoitchkov's actions in this case. In fact, Mr. Llerena acknowledges that "the vast majority of jurisdictions have adopted a recklessness standard." (Pl.'s Opp'n at 2.) Mr. Llerena makes no argument for the application of the mere negligence standard. Instead, he asks the Court to defer ruling on the question at this point in time. (Id.) Given the overwhelming number of decisions applying the

recklessness standard, Mr. Llerena's failure to make any argument for the application of the negligence standard, that a ruling on this issue is necessary to determine Defendants' entitlement to summary judgment on Mr. Llerena's negligence claim, and the advantage of resolving this issue now so that the parties can properly evaluate their respective cases as this matter moves toward mediation and trial, the Court should rule that the recklessness standard will govern. As such, Defendants are entitled to summary judgment on Count I of Plaintiff's First Amended Complaint, which states a cause of action for mere negligence. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 11-13.)

**B. Mr. Llerena's Opposition Fails to Raise Any Dispute Regarding Facts Material to Defendants' Motion for Summary Judgment and Relies Heavily on Inadmissible Evidence**

Mr. Llerena, in his Opposition and accompanying Statement of Genuine Issues (Mr. Llerena's "Statement"), does not dispute the genuineness of any material fact identified in Defendants' Statement of Material Facts. Rather, Mr. Llerena's Statement lists a number of immaterial facts and legal conclusions. More importantly, Mr. Llerena's Statement and Opposition is riddled with inadmissible hearsay and lay opinion testimony. In ruling on a motion for summary judgment, however, a court may only consider evidence that would be admissible at trial and should therefore disregard inadmissible evidence. Maytag Corp. v. Electrolux Home Prod., Inc., 448 F. Supp. 2d 1034, 1062 (N.D. Iowa 2006) (citing Fed. R. Civ. P. 56(e); stating that "both a motion for summary judgment and a resistance to such a motion must be based on admissible evidence"; also noting that it is proper for the court to disregard inadmissible evidence when ruling on a motion for summary judgment); see also Wilson v. Clancy, 747 F. Supp. 1154, 1158 (D. Md. 1990). The

Court should therefore disregard the hearsay statements and lay witness opinions contained in Mr. Llerena's Statement and Opposition. These statements include the MLS Witness Summaries in their entirety, opinions by lay witnesses Todd West, Andrew Chapin, and Thomas Rongen, and hearsay statements offered by Todd West.

The statements contained in the MLS Witness Summaries constitute inadmissible hearsay evidence. In fact, these statements are double hearsay (or hearsay-within-hearsay) as neither the individual to whom the statements are attributed nor the person who authored the summaries of the oral conversations were deposed in this matter. It is hornbook law that a statement by an out-of-court declarant offered for its truth is inadmissible. See Fed R. Evid. 801. It is also an elementary principal of evidence that even if an exception were to apply to a document – for instance, the business or public records exception – the underlying statement in a double-hearsay scenario must also fall under an exception to be admissible. See Fed. R. Evid. 805; see also United States v. Sesay, 313 F.3d 591, 598 (D.C. Cir. 2002) (affirming district court's exclusion of witness statements in a police report). In this case, Mr. Llerena has failed to show that any exception applies to either level of hearsay involved in the MLS Witness Summaries. As such, these statements are the very type of inherently unreliable evidence the hearsay rule was designed to exclude. The Court should therefore disregard references to the MLS Witness Summaries contained in Mr. Llerena's Statement at paragraphs 4B, 4C, 5B, and 6B and in Mr. Llerena's Opposition on pages 1, 9-12, 16, and 17 and Exhibit 7.

Also inadmissible as hearsay not subject to an exception are the statements of the unnamed American University players offered by Todd West. The Court should therefore disregard references to these statements contained in Mr. Llerena's Statement at paragraph 4E and in Mr.

Llerena's Opposition on pages 10 and 25.

Mr. Llerena also relies heavily on statements by Todd West, Andrew Chapin, and Thomas Rongen that constitute opinion testimony. No party to this action, however, has identified any of these individuals as experts in this matter pursuant to Rule 26(a)(2) and the Court's Scheduling Order. These individuals are therefore lay witnesses and cannot express opinions that are based on "specialized knowledge" outside the expertise of the average person. See Fed. R. Evid. 701. The following are example quotes or paraphrased quotes by these individuals that contain such opinion testimony (opinion testimony italicized):

1. According to Coach West, *Stoitchkov remained "so pissed off he kicked the ball into the corner so that he would have more time to turn around and yell at the assistant referee."*[1] (Pl.'s Stmt. at ¶ 4E.)

2. Further, although the Competition Incident Report states that Chapin sent Stoitchkov off for "serious foul play," after seeing the video, Chapin *would have described it as "violent conduct" – a more serious infraction of the rules that is "more an act of aggression."* (Pl.'s Stmt. at ¶ 7D.)

3. Rongen[2] had *no doubt that Stoitchkov was bracing himself as he went in because he knew there would be contact and that Stoitchkov "clearly wanted to make a statement."* (Pl.'s Stmt. at ¶ 5B.)

---

[1] Even had Mr. West been properly designated as an expert witness, Defendants would argue that this particular statement is inadmissible under Rule 702 as it amounts to nothing more than mere conjecture.
[2] As explained above, all statements attributed to Mr. Rongen, whether an observation or opinion, are inadmissible hearsay.

5

These opinions are clearly based on specialized knowledge of soccer – how it is played, its rules, and its customs – outside the expertise of the average person. As such, they are inadmissible as lay opinions under Rule 701. Other opinions by these individuals in Mr. Llerena's Statement and Opposition are of the substantially same nature. Accordingly, the Court should disregard these opinions contained in Mr. Llerena's Statement at paragraphs 4E, 5A, 5B, and 7D and in Mr. Llerena's Opposition on pages 10-13.

### C. Mr. Llerena Relies on Antiquated Law to Refute The Need For Expert Testimony to Support His Negligent Hiring, Retention, and Supervision Claim

Mr. Llerena relies on Morgan v. District of Columbia, 449 A.2d 1102 (D.C. 1983), a 1983 case involving a police officer who went on a shooting rampage, to rebut Defendants' argument that his negligent hiring, retention, and supervision claim is barred by his failure to provide expert testimony as to the standard of care. (Pl.'s Opp'n at 28.) The Morgan opinion, which was later abrogated on other grounds, predates District of Columbia v. Hampton, 666 A.2d 30 (D.C. 1995), the controlling District of Columbia law on which Defendants rely, by 12 years. In addition, Morgan is factually dissimilar to the facts here.

In Morgan, a police officer shot his wife and others with his service revolver. 449 A.2d at 1105-1106. The officer had previously threatened his wife using his service revolver and these instances were reported to the police department. Id. Despite a police directive to investigate such matters, the police did not take affirmative action. Id. In the plaintiff's case against the District of Columbia, the Morgan Court held it was not necessary for the plaintiff to put forth expert testimony on the standard of care to be applied to the police department's inaction. Id. at 1109.

Here, there are no facts that MLS, D.C. Soccer, or AEG were ever given notice of Mr. Stoitchkov threatening harm to an opposing player in general or Mr. Llerena specifically.

Moreover, there is no evidence that MLS, D.C. Soccer, or AEG failed to follow their own policies regarding the employment of Mr. Stoitchkov. In other words, this case is not as simple as the one in Morgan. Mr. Llerena's negligent hiring, retention, and supervision claim here involves the hiring, training, and supervision of a professional international soccer player – a specialized undertaking not the subject of an operational memorandum and not as black-and-white as the need to discipline a police officer who has been using his service revolver to threaten his estranged wife. Morgan is therefore inapposite to this case. Accordingly, this Court should follow the clear mandate of Hampton and grant summary judgment on Mr. Llerena's negligent hiring, retention, and supervision claim in favor of MLS, D.C. Soccer, and AEG.

### D. In Arguing that Mr. Stoitchkov's Conduct Was Reckless, Mr. Llerena Focuses On Everything But the Play on the Field

Although Mr. Llerena agrees with Defendants that it is Mr. Stoitchkov's actions that must be evaluated in determining whether Mr. Stoitchkov was reckless (Pl.'s Opp'n at 15), Mr. Llerena's Opposition devotes little space to discussing the actual play. To the contrary, Mr. Llerena devotes the majority of his Opposition to obsessing over Mr. Stoitchkov's dispute with the assistant referee after the American University goal, rehashing dissimilar events involving Mr. Stoitchkov that occurred over 12 years prior to this incident, and generally downplaying the competitive nature of the match. By doing so, Mr. Llerena attempts to deflect attention away from the actual play – the position on the field, the location on the ball, and the proximity of the American University goal – and instead focus on extraneous issues with far more inflammatory potential albeit dubious relevance. Fortunately, the play was captured on video from two distinct angles and has been provided to the Court for its review. It is the actual play – the movements of the players and the ball – that should guide the Court's decision.

### 1. Mr. Llerena Places Undue Emphasis On Mr. Stoitchkov's Dispute With the Assistant Referee

Quoting liberally from the MLS Witness Statements, which are inadmissible as explained above, and other witnesses, Mr. Llerena's Opposition variably describes Mr. Stoitchkov's dispute of the no offsides call as a "tirade" (Pl.'s Opp'n at 1) or a "tantrum" (id. at 15) and Mr. Stoitchkov himself as "furious" (id. at 21) and "enraged" (id. at 26). To support such descriptions, however, Mr. Llerena relies only on evidence that Mr. Stoitchkov dissented with the assistant referee and used the f-word. (See, e.g., id. at 9-10.) There is no evidence that Mr. Stoitchkov touched the assistant referee. In fact, the evidence shows that he remained a good distance away. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 7.) Mr. Stoitchkov did not throw objects onto the field (cf. Bobby Knight) or act in such a way that play had to be stopped until he was brought under control. Tellingly, Mr. Stoitchkov's dissent was not captured by either of the videographers taking the videos that have been submitted to the Court – an indication that Mr. Stoitchkov's dissent was not all that noteworthy.

As mentioned by Defendants in their initial Memorandum, that Mr. Stoitchkov was not issued a yellow card is also telling that his dissent was not a serious problem. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 7.) On this point, Mr. Llerena's Opposition skirts with mischaracterizing the facts. Mr. Llerena properly points out that the assistant referee was not empowered to issue a yellow card to Mr. Stoitchkov for his dissent. (See Pl.'s Opp'n at 10.) Mr. Llerena, however, conveniently failed to mention that the assistant referee could have simply asked the head referee to issue a card if he thought Mr. Stoitchkov's conduct justified such a sanction. (See Clement Dep. at 26-28; relevant portions attached as **Exhibit I**.)

Taking the facts in the light most favorable to Mr. Llerena, Mr. Stoitchkov did use the f-

word in his dissent with the assistant referee. While we all can agree that the use of profane language has no place in civilized society, its use on the soccer field is apparently commonplace. Peter Ramsey, one of Plaintiff's liability experts, admitted to using profane language to berate referees during adult men's league games in which he used to play. (Ramsey Dep. at 33-35; relevant portions attached as **Exhibit II**.) Coach Todd West explained that he has, in the past, had a problem with his American University players running their mouths on the field and using profane language in dissenting with referees. (West Dep. at 32-33; relevant portions attached as **Exhibit III**.) In short, although Mr. Stoitchkov can be rightly criticized for his choice of words, his use of such language cannot be used as a basis to find that his tackle of Mr. Llerena, during the course of play and concomitant with a challenge for a loose ball, was reckless.

### 2. <u>Sieber</u> Is Unavailling to Mr. Llerena's Position That Mr. Stoitchkov Acted Recklessly

Mr. Llerena chastises Defendants' reliance on <u>Bentley v. Cuyahoga Falls Bd. of Educ.</u>, 709 N.E.2d 1241 (Ohio Ct. App. 1998), a soccer case, and instead argues that a case involving two polo players is more applicable. (Pl.'s Opp'n at 18-19.) In doing so, Mr. Llerena generally mocks the talent of female soccer players and argues that, unlike Ellie (the female soccer player in <u>Bentley</u>), Mr. Stoitchkov's tackle cannot be regarded as "poorly executed." (<u>Id</u>. at 19.) Mr. Llerena, however, will not dispute that Mr. Stoitchkov, just as Ellie had, performed a less-than-perfect tackle. A perfect tackle would have resulted in Mr. Stoitchkov kicking the ball away from Mr. Llerena and toward another D.C. United player without ever touching Mr. Llerena.

Unfortunately, and although he did avoid a body-to-body collision,[3] Mr. Stoitchkov was unable to avoid all contact.

Mr. Llerena's reliance on Sieber v. Wigdahl, 704 F. Supp. 1519 (N.D. Ill. 1989), a polo case, is misplaced. Sieber involved an incident between two polo players who had prior confrontations earlier in the match. Id. at 1524. This "bad blood" between the two players involved in Sieber was critical to the court's denial of summary judgment. As Mr. Llerena admits, there was no such "bad blood" between him and Mr. Stoitchkov prior to this incident. (Pl.'s Opp'n at 21.)

Finally, it is important to note that Mr. Llerena does not dispute the applicability of Jaworski v. Kiernan, 696 A.2d 332 (Conn. 1997), the other soccer case relied on by Defendants.

### 3. Mr. Llerena Mischaracterizes the Temperature of the Match

Throughout his Opposition, Mr. Llerena describes the subject match as a "meaningless" affair in an apparent attempt to portray the contest as one nobody cared about except for Mr. Stoitchkov. Although the general rule for soccer scrimmages is that they are low temperature events, this was not the case here. This was not a charity exhibition; these teams were each preparing for their upcoming seasons. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 3 and 5.) Starting positions and pride were on the line. (See id. at 6.) Regardless of any initial anticipation to the contrary, this match quickly became very competitive. (Id. at 6-7.)

Mr. Llerena's castigation of the subject match as meaningless leads one to ponder what is truly "meaningless" in the context of sports. Just about everyone would agree that an intra-squad scrimmage during the first week of NFL training camp is meaningless in the grand scheme of the

---

[3] Both videos show that Mr. Stoitchkov did not plow through Mr. Llerena in the manner a defender in American football would tackle a ball carrier. Rather, Mr. Stoitchkov's left foot and leg, while he was in the process of stopping and turning his body away, contacted Mr. Llerena's right leg.

10

entire season. However, just last week at the Tennessee Titans training camp, a fight involving their superstar quarterback Vince Young erupted during a routine scrimmage. (See NFL.com Article; attached as **Exhibit IV**.) Obviously, the scrimmage was sufficiently important to those involved to evoke very powerful emotions. On the other hand, there are likely a great number of people who would classify all sporting endeavor as meaningless in the greater context of world events. The meaningfulness of an athletic contest is therefore an individual determination.

Although a non-interested person seeing the subject match on American University's or D.C. United's schedule at the beginning of 2003 might not have placed much significance on the event, the players certainly came to play. (See Defs.' Mem. in Supp. of Mot. for Summ. J. at 7.) In their minds, the match was not meaningless. As Mr. Llerena explained, his team wanted to win. (Llerena Dep. at 77-78; relevant portions attached as **Exhibit V**.) He and his teammates knew that their coaches would judge their performance. (Id. at 78-79.) As for D.C. United, they were primed to begin league play the following week and were coming into peak form. They were not expected to play at half-speed and took the field in a businesslike manner intending to win. (See Defs.' Mem. in Supp. of Mot. for Summ. J. at 7.) Clearly, to the players involved in this match, it was not meaningless.

### 4. Mr. Llerena Mischaracterizes Mr. Stoitchkov

More than once in his Opposition, Mr. Llerena suggests that Mr. Stoitchkov is lying about events in his past. For instance, Mr. Llerena infers that Mr. Stoitchkov was being less than forthcoming when he explained that he "stepped" rather than "stomped" on the foot of a referee while playing for Barcelona.[4] (Pl.'s Opp'n at 7, n.2.) Mr. Llerena also describes Mr. Stoitchkov's description of the 1985 Bulgarian Cup incident as "self-serving." (Pl.'s Opp'n at 29.) Mr. Llerena, however, offers no countervailing evidence to support a different version of events for either incident. Mr. Stoitchkov is the only witness in this case with first-hand knowledge of what actually transpired during those two events and has the best understanding of the back-room politics underlying his suspensions.

Mr. Llerena also cites nicknames given to Mr. Stoitchkov years ago while he was playing in Europe as evidence of his character. Mr. Llerena, however, does not offer any evidence of who gave Mr. Stoitchkov these nicknames, why they were given, and what they truly mean. As explained by defense expert Dr. Joseph Machnik, an athlete's nickname is more often a promotional tool than an accurate description of the athlete's character. (See Machnik Dep. at 70-71; relevant portions attached as **Exhibit VI**.) Accordingly, Mr. Llerena's attempt to use meaningless nicknames to cast Mr. Stoitchkov as a walking menace rings hollow. As such, any nickname ever used to refer to Mr. Stoitchkov has no bearing on the Court's inquiry here.

---

[4] Mr. Llerena points to defense counsel's use of the word "stomped" while referencing the event during a deposition as an accurate description of the event. Defense counsel, however, was merely restating an allegation in Plaintiff's First Amended Complaint. Defense counsel, who was only 17 years old at the time and who has never viewed a match involving FC Barcelona either in person or on television, was not an eyewitness to the event and has no personal knowledge of what actually transpired.

Mr. Stoitchkov, however, does not dispute that he was a passionate competitor on the soccer pitch. His competitive nature combined with his athletic gifts made him a superstar. Like all great athletes – Tiger Woods, Brett Farve, and Lance Armstrong to name a few – Mr. Stoitchkov strives to win every time he engages in competition. Mr. Stoitchkov's unyielding desire to win was present when he was playing soccer in front of millions at the World Cup. That same desire still exists today when he plays a round of golf with a foursome of old friends. That desire did not make Mr. Stoitchkov a menace to his fellow athletes. It did, however, make him one of the greatest soccer players ever.

## CONCLUSION

For all the foregoing reasons, Defendants request that the Court enter summary judgment in their favor on all counts in Plaintiff's First Amended Complaint. In the alternative, Defendants request that partial summary judgment be entered in favor of (1) D.C. Soccer and AEG as to Counts I, II, and III; (2) MLS as to Count III; and (3) Hristo Stoitchkov as to Count IV.

_____/ s /_____
Daniel R. Lanier
Federal Bar No.: 04504
Brian W. Casto
Federal Bar No.: 28010
MILES & STOCKBRIDGE P.C.
10 Light Street
Baltimore, Maryland  21202
410-727-6464

Attorneys for Defendants